**STATE of Minnesota, Respondent,**

v.

**John Steven MARTIN, Appellant.**

No. C7–97–280.

Court of Appeals of Minnesota.

July 22, 1997.

Review Denied Sept. 18, 1997.

Hubert H. Humphrey, III, Attorney General, James B. Early, Assistant Attorney General, St. Paul, for Respondent.

Marvin E. Ketola, Carlton County Attorney, Carlton, for Respondent.

Gary R. Bryant–Wolf, Barristers Trust Building, Minneapolis, for Appellant.

Considered and decided by TOUSSAINT, C.J., and PARKER and HARTEN, JJ.

## OPINION

TOUSSAINT, Chief Judge.

This appeal is from a district court order denying appellant John Steven Martin's motion to dismiss the grand jury indictment charging him with first-degree premeditated murder and first-degree murder in the course of a kidnapping. *See* Minn.Stat. § 609.185(1), (3) (1996). We affirm.

## FACTS

Martin and four co-defendants have been charged with first-degree murder, or aiding and abetting first-degree murder, in the August 28, 1996, death of Paul Antonich in Carlton County. The Carlton County attorney initially filed complaints charging the five men with second-degree murder, along with various other charges, pending the impaneling of a grand jury to hear the case. The prosecution then presented its case against all five men—Martin, Jamie Aubid, Andy DeVerny, Lester Greenleaf and John Alexander ("Mike") Martin—to the same grand jury. The grand jury indicted Martin for first-degree premeditated murder and first-degree murder in the course of a kidnapping, and indicted Martin's co-defendants for aiding and abetting first-degree murder.

When the prosecutor told the grand jurors they would be considering the Antonich death he asked whether they had heard of the case through the news media. When they responded that they had, he asked whether anyone was biased because of the news media accounts. They responded, "No," and the prosecutor moved on to a summary of the evidence.

The prosecutor relied heavily on the confessions of four of the five suspects (all but Jamie Aubid) in supporting the state's theory that (1) Antonich had accidentally rear-ended a car, driven by Martin, in which the five men were riding in Duluth, (2) some of the men beat Antonich at the scene, (3) the suspects hijacked Antonich's car at Martin's direction, driving Antonich to another location in Duluth where they beat him again, and (4) the suspects then drove Antonich to Ditchbank Road in Carlton County where Martin shot him.

After the prosecutor had summarized the facts he would present, a grand juror asked whether the men had been charged with second-degree murder. The prosecutor responded that they had, and when a grand juror asked the difference between first- and second-degree murder, the prosecutor gave them the definition of second-degree murder, stating, however, that he didn't "want to confuse you with options at this point." He again responded to a question on the same subject, repeating that all five men had been charged with second-degree murder.

The prosecutor presented most of the evidence of the four suspects' confessions through Sergeant Mangan, who had begun by interviewing "Mike" Martin. "Mike" Martin described how the car in which they were riding was rear-ended in Duluth by Antonich. He then described the beating at the scene, followed by the hijacking of Antonich's car, the drive to Skyline Boulevard, the second beating, and then the trip back on the Interstate to Carlton County, where Antonich was shot along Ditchbank Road.

Sergeant Mangan testified that the suspects' confessions were taped. When a grand juror asked whether they would be allowed to listen to the tapes, the prosecutor responded that they could, but noted that the tapes were "very lengthy" and transcripts would not be available. The tapes, which were 16 hours long, were submitted to the grand jury when they began deliberations. They were not transcribed until after the indictment was returned.

The medical examiner who conducted the autopsy testified that Antonich had been severely beaten. The body had four bullet wounds, and three bullets were recovered. A .22 caliber handgun was recovered in the water underneath the Blatnik Bridge, at the spot to which all four suspects who confessed had independently led police. The Bureau of Criminal Apprehension (BCA) tested the gun, the bullets recovered, and a spent cartridge found at the murder scene. The BCA examiner concluded that the spent cartridge had been fired by the .22 handgun found beneath the bridge. There were not sufficiently detailed markings on the recovered bullets to establish conclusively that they had been fired from the same gun, although their markings were consistent with having been fired from it.

At the conclusion of the testimony, the prosecutor instructed the grand jury on the elements of first-degree premeditated murder and first-degree murder committed in the course of a kidnapping. A grand juror questioned him about second-degree murder and whether lesser offenses could be submitted at trial. The prosecutor responded that it was possible that the judge might give an instruction on a lesser-included offense at trial. The grand juror then asked:

> So in other words, I take it that if we feel that if a first-degree conviction cannot be obtained on a certain person or persons, we should go for the first-degree?
>
> [PROSECUTOR]: That's right. Your determination is to make a probable cause determination as to the charges that I've given you.

The grand jurors asked more questions about possible trial outcomes and about potential penalties. The prosecutor told them the potential sentences for first-degree and second-degree murder. He also told the grand jury that they should not concern themselves with the possible penalties. A grand juror then asked again for the definition of second-degree murder, but the prosecutor told him that that offense was not under consideration and declined to provide the definition.

## ISSUE

Did the prosecutor commit misconduct subverting the independence of the grand

jury and requiring dismissal of the indictment?

## ANALYSIS

 A presumption of regularity attaches to a grand jury indictment, which will be invalidated only in a rare case. *State v. Inthavong*, 402 N.W.2d 799, 801 (Minn.1987). An indictment must be based on admissible evidence, but may be sustained despite the presentation of inadmissible evidence if there is sufficient admissible evidence to sustain the indictment and if it is not shown that the impermissible evidence has influenced the grand jury to return an indictment it otherwise would not have returned. *State v. Roan*, 532 N.W.2d 563, 570 (Minn.1995). An indictment should be dismissed if the prosecutor knowingly committed misconduct in presenting evidence to the grand jury

> and if the misconduct substantially influenced the Grand Jury's decision to indict in the way it did or if the court is left with grave doubt that the decision to indict was free of any influence of the misconduct.

*State v. Montanaro*, 463 N.W.2d 281, 281 (Minn.1990).

Martin raises eight claims of alleged error that he argues cumulatively tainted the grand jury proceedings. *See generally State v. Grose*, 387 N.W.2d 182, 190 (Minn.App. 1986) (considering cumulative effect of procedural errors, as well as violations of defendant's constitutional rights). We will address first the challenges to the evidence presented to the grand jury and then consider the other claims of a procedural nature.

Martin argues that the prosecutor presented inadmissible evidence to the grand jury and that he improperly withheld exculpatory evidence. We disagree and find little in these arguments that merits discussion.

 Evidence that Jamie Aubid, who was displaying a handgun earlier on the afternoon of August 28, expressed an intent to kill someone because he had been cheated in a marijuana deal clearly had no significant influence on the grand jury's indictment. Martin presents no authority supporting his argument that this background evidence was inadmissible. Even if the evidence were inadmissible, it did not show Martin's own state of mind or a state of mind that significantly influenced the events allegedly leading to Antonich's death. If anything, the evidence suggested that Aubid had a greater role in the offense, and Martin a lesser role, than the other suspects described.

 The grand jurors themselves elicited the evidence regarding Martin's lack of remorse and his lack of intoxication when he was questioned by police. Even assuming the prosecutor had a duty to prevent the witness from responding as he did, this is not the type of evidence that would have substantially influenced the grand jury's decision. Although Martin's state of sobriety would have some relevance to the reliability of his confession, the indictment rested also on the confessions of three of the other suspects, as well as the circumstantial evidence.

 Martin argues that the prosecutor improperly withheld exculpatory evidence, including evidence of his remorse, mental illness and intoxication when questioned, and evidence that "Mike" Martin had referred to a shooting that "he," rather than "they," committed. *See generally State v. Olkon*, 299 N.W.2d 89, 106 (Minn.1980) (failure to present exculpatory evidence to grand jury requires reversal only if it would have materially affected the proceedings) *cert. denied*, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).[1]

 Martin's remorse, or lack of it, was relevant only if it had some relation to Martin's state of mind at the time of the shooting. *Cf. Montanaro*, 463 N.W.2d at 281 (omitted evidence of remorse left grand jury with "arguably false impression of defendant's state of mind following the shooting").

---

1. We need not address the state's argument that *Olkon* and other Minnesota cases imposing a duty to present exculpatory evidence have been overruled by the United States Supreme Court's recent decision holding federal prosecutors need not present exculpatory evidence to a grand jury.

*United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). It appears, however, that *Olkon* does not rely so totally on federal law as to be overruled by *Williams*. *See also Montanaro*, 463 N.W.2d at 281.

Martin, however, was arrested several days after the shooting. Evidence of his apparent suicide attempt, although evidence the relevancy of which Martin can argue at trial, is not the type of material exculpatory evidence that would have influenced the grand jury's decision to indict. Evidence concerning Martin's possible intoxication when being questioned also was not material to the grand jury's probable cause determination.

Evidence that "Mike" Martin used the pronoun "he" in referring to the shooting is vague, dependent on hearsay of questionable admissibility, and has almost no significance in the grand jury's assessment of probable cause.

Martin's other claims are directed at procedural flaws that he contends subverted the independence of the grand jury. Martin claims that the prosecutor (1) failed to question the grand jurors about their exposure to media accounts, (2) engaged in discussion of irrelevant issues, including charges already filed by complaint, possible trial outcomes and potential sentences, (3) gave erroneous legal advice, (4) refused to instruct the grand jury on seconddegree murder, and (5) improperly submitted untranscribed tapes for the grand jury to consider during deliberations.

■ Martin argues that when the grand jurors acknowledged they had been exposed to media accounts of Antonich's death and the subsequent investigation, the prosecutor should have questioned them to determine whether they had developed any biases in the case.

■ The supreme court has disapproved of a prosecutor's conduct in telling a grand jury at their orientation session that there might be newspaper· accounts of the cases they would be considering without at the same time discouraging them from exposing themselves to such accounts. *State v. Johnson*, 441 N.W.2d 460, 465–66 (Minn.1989). But *Johnson* dealt with prospective exposure, a future event that the grand jurors could still avoid. In this case, the grand jurors had been exposed to media coverage of the Antonich investigation before they were impaneled. The supreme court has

declined to hold that a prosecutor must inquire into grand jurors' exposure to media accounts of the case. *Roan*, 532 N.W.2d at 570. Nor does *Johnson* require an inquiry into the effects of such exposure.

■ Martin also argues that the prosecutor subverted the independence of the grand jury by revealing to them that he had already charged the five men with second-degree murder and by discussing the possible submission of lesser-included offenses at trial, possible trial outcomes, and potential sentences for different degrees of homicide.

Martin cites six references by the prosecutor to the complaints already filed against the five suspects. Five of these references, however, came in response to questions from the grand jurors or in following up on their questions. Only the first reference, when the prosecutor was explaining to the grand jurors their responsibility for determining whether there was probable cause to support first-degree murder charges, was volunteered by the prosecutor without any questions from the grand jury.

■ The grand jury has the sole responsibility under the rules of criminal procedure for determining whether there is probable cause to charge a suspect with first-degree murder. Minn. R.Crim. P. 18.06, subd. 2; *see State v. Stewart*, 486 N.W.2d 444, 446 (Minn.App.1992). The grand jury may, however, choose to indict on a lesser degree of homicide. *See, e.g., State v. Pettee*, 538 N.W.2d 126, 127 (Minn.1995) (indictment for third-degree murder and second-degree manslaughter) *cert. denied*, —— U.S. ——, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996). The trial court instructed the grand jury that charges already filed would be dismissed if they did not return an indictment on those offenses. *See* Minn. Judges Criminal Benchbook 3–A2 (1993 and Supp.1997) (suggesting this instruction as part of sample charge to grand jury).

It may have been better to omit any reference to the complaints charging Martin and the other men with second-degree murder and other offenses. But arguably this information was necessary for the grand jury to make sense of the court's instruction on the

effect of their failure to indict. In any event, we conclude that this information, which was repeated only in response to the grand jury's questions, did not subvert the independence of the grand jury. A greater danger to the grand jury's independence would be posed if a prosecutor, knowing she had ample probable cause for some degree of homicide, but little evidence of premeditation, deliberately kept information about lesser offenses from the grand jury.

■ Martin also challenges the prosecutor's discussions with the grand jury about possible trial outcomes and potential sentences. As a general rule, a grand jury should not be informed of other events in the criminal prosecution that are irrelevant to the grand jury's decision. *See State v. Johnson,* 441 N.W.2d at 464–65 (quoting with approval trial court memorandum finding error in the prosecutor telling the grand jury to consider the prosecutor's "office standard" of probable cause and to consider plea negotiations in deciding whether to indict). All of the prosecutor's references to possible decisions at trial and in sentencing, however, came in response to grand jury questions. The prosecutor, who was drawn into these discussions by repeated questioning, emphasized at several points that the grand jury should not consider the extraneous issues of trial outcomes and possible sentences. There is no evidence of any intentional misconduct aimed at subverting the independence of the grand jury. To the contrary, the prosecutor attempted to avoid this result.

■ Martin argues that the prosecutor gave erroneous legal advice in the course of the following exchange with a grand juror:

> JUROR: So in other words, I take it that if we feel that if a first-degree conviction cannot be obtained on a certain person or persons, we should go for the first-degree?
> [PROSECUTOR]: That's right. Your determination is to make a probable cause determination as to the charges that I've given you. * * * *

This exchange may reflect only the prosecutor's misunderstanding of the question or a misstatement in the response. Even taken at face value, the prosecutor's response did not subvert the grand jury's independence. The grand jury had been instructed that they were not "obligated" to return an indictment, even if there was probable cause, if they felt there was not a "reasonable prospect of a conviction of a charge." This did not mean, however, that they were barred from indicting on first-degree murder if they felt a conviction could not be obtained. Therefore, the prosecutor's response was not incorrect, although it may have been incomplete. Furthermore, the grand jury's function was only to determine whether probable cause existed, and the prosecutor was justified in attempting to focus their attention on that issue.

■ Martin argues that the prosecutor erred in refusing a grand jury request for a charge on second-degree murder. But the grand juror who posed the question asked only for the definition of second-degree murder. It is not clear the grand juror was requesting a second-degree murder charge for the grand jury's consideration. Even if the prosecutor were refusing a request for a charge on second-degree murder, there is no authority requiring the prosecutor to submit lesser offenses to the grand jury.

■ Finally, Martin argues that the prosecutor committed misconduct in presenting the grand jury with the tapes of the four confessions.

The submission of the untranscribed tapes was at most a technical violation of the rule requiring a verbatim record of evidence taken before the grand jury. *See* Minn. R.Crim. P. 18.05, subd. 1 (verbatim record to be made of evidence presented to the grand jury). The tapes provide their own record, and, unlike unrecorded verbal statements or nonverbal events occurring in the grand jury's presence, can always be transcribed later, as they have been in this case. Furthermore, the tapes are 16 hours long. The grand jury deliberated less than five hours and could not have listened to much, if any, of the tapes. Moreover, the prosecutor had cautioned them to be "extremely careful" about playing the tapes, which were originals, lest they erase portions of them. It is unlikely the grand jurors, ignoring this warning, were exposed to the allegedly prejudicial material in the tapes.

Martin argues that the cumulative effect of the errors he has alleged requires dismissal of the indictment. *See generally State v. Grose,* 387 N.W.2d at 190 (considering cumulative effect of prosecutor misconduct as well as violations of defendant's constitutional rights). But there was no violation of Martin's constitutional rights, as there was in *Grose.* Furthermore, there was no error in the presentation of evidence to the grand jury. Although we believe that extraneous issues were improperly discussed, this was prompted almost entirely by questions from the grand jurors themselves, and there is no indication that any misconduct was intentional. In this case in which the evidence supporting probable cause was overwhelming, we cannot conclude that these responses to the grand jurors' own questions subverted the independence of the grand jury so as to require dismissal of the indictment.

## DECISION

The prosecutor did not commit misconduct subverting the independence of the grand jury and requiring dismissal of the indictment.

**Affirmed.**