**STATE of Minnesota, Respondent,**

v.

**Lester GREENLEAF, Appellant.**

No. C7–97–2322.

Supreme Court of Minnesota.

April 15, 1999.

Michael F. Cromett, Roseville, for appellant.

Hubert H. Humphrey III, Minnesota Attorney General, Catherine M. Keane, Assistant Attorney General, John B. Galus, Assistant Attorney General, St. Paul; Marvin E. Ketola, Carlton County Attorney, Carlton, for respondent.

## OPINION

RUSSELL A. ANDERSON, Justice.

A grand jury in Carlton County indicted Lester Greenleaf on the charge that he aided and abetted the first-degree murder of 17–year–old Paul Antonich in violation of Minn. Stat. §§ 609.185, subd. 3, and 609.05, subd. 1 (1998). Venue of the trial was changed to Dakota County, and Greenleaf, who was tried jointly with Andy Leo DeVerney, was convicted of the offense and sentenced to life imprisonment. On appeal, Greenleaf argues that his conviction should be reversed. We affirm.

At approximately 8:30 p.m. on August 28, 1996, Antonich was driving his parents' car through Duluth to his family's home in Two Harbors. At the intersection of Sixth Avenue East and Ninth Street in Duluth, Antonich's vehicle bumped into a vehicle driven by John Steven Martin. John Steven Martin and his four friends, DeVerney, Jamie Aubid, John Alexander "Mike" Martin ("Mike Martin"), and appellant, Greenleaf, exited the vehicle driven by John Steven Martin and began verbally and physically assaulting Antonich. Mike Martin, DeVerney, and a bystander testified that they saw Greenleaf reach in through the window and strike Antonich. Greenleaf testified that he was not sure whether he hit Antonich, but said he might have because it was likely that hitting someone resulted in reopening a cut on his hand. Greenleaf claimed that, at the time, he was on a 2–week drinking binge, and that he had consumed 18 to 20 beers that day.

Following this initial assault, Greenleaf got into the driver's seat of Antonich's parents' car and pushed Antonich over into the front passenger seat. The four other men returned to the vehicle John Steven Martin had

been driving and both vehicles left the scene of the accident. The two cars then proceeded to the intersection of 15th or 16th Street West and 3rd Street where the men again exited the vehicle driven by John Steven Martin, pulled Antonich from his car and assaulted him. Greenleaf testified that he was struggling to get the key out of the car's ignition when this second beating began, but that when he exited the vehicle he got between Antonich and his friends in an attempt to stop the assault. According to Greenleaf, John Steven Martin then pulled out a gun and stated that he wanted to "take [Antonich] and shoot him." Greenleaf testified that Martin "looked crazy."

Following the second assault, Antonich was shoved into the back seat of his parents' car, with Greenleaf behind the wheel and DeVerney joining him in the front passenger seat, as they followed the vehicle driven by John Steven Martin onto Interstate 35. Greenleaf claimed that he attempted to lose John Steven Martin several times by slowing his vehicle but that each time he slowed down, John Steven Martin also slowed the vehicle he was driving. Greenleaf also testified that after driving several miles on Interstate 35, he stopped Antonich's car on the side of the highway but John Steven Martin also stopped the car he was driving and ran back to Antonich's car. Greenleaf testified that he implored Martin to "stop right here, man. I don't want—I don't want to take this any further [be]cause, you know, I know what we did was wrong * * * ." According to Greenleaf, Martin demanded that Greenleaf "just keep * * * driving the car. Quit being a chicken * * * ." Greenleaf explained that he did not argue and continued to drive because he had seen what Martin was capable of doing.

Both cars then proceeded for several miles to Ditchbank Road, located in a remote area on the Fond du Lac reservation outside Cloquet, approximately 35 miles from Duluth. Antonich was then pulled from his parents' car and John Steven Martin shot him four times, killing him. Greenleaf testified that he took no part in removing Antonich from the car and was still in the vehicle when Martin pulled the trigger. While the other three men placed Antonich's body in the trunk of his parents' car, Greenleaf and DeVerney wiped Antonich's parents' car inside and out to remove fingerprints. John Steven Martin then drove Antonich's parents' car into a drainage ditch, got back in the car he had been driving and drove all five men back to Duluth. The following morning, all five men got together, drove to the Blatnik Bridge and threw the gun into Lake Superior.

Later that afternoon, a logger discovered Antonich's parents' car in the ditch and alerted authorities. Police officers had the vehicle towed from the ditch and discovered Antonich's body in the trunk. St. Louis County medical examiner, Dr. Donald Kundel, performed an autopsy and concluded that Antonich's death was caused by two gunshot wounds, one to the heart and one to the right forehead. Antonich suffered two other gunshot wounds, one to the neck and one to the chin. Dr. Kundel also testified that Antonich had suffered a severe beating evidenced by blunt trauma to his ear, eyes, head, face, jaw, nose, forehead, neck, shoulders, and chest. Dr. Kundel estimated that Antonich had suffered between 50 and 100 blows with either fists or feet, and that some of the blows, most notably to the head and ears, broke the skin. Investigators also found large amounts of blood in Antonich's parents' vehicle. Some of the blood found on the driver's door and seat was determined to be Greenleaf's blood. Greenleaf's blood was also found on a cloth in the trunk of the car John Steven Martin had driven.

Earlier on the morning after the murder, Mike Martin had talked to a friend, Lawrence Murray, about someone having been killed the night before with a gun. When Murray saw news reports about Antonich's death, he called authorities. The following day, August 30, 1996, police officers arrested Mike Martin and he admitted his involvement in Antonich's murder. Nearly nine months later, on May 8, 1997, Mike Martin reached a plea agreement with the state whereby he would plead guilty to aiding and abetting intentional second-degree murder in exchange for his truthful testimony at the trials of the other four accomplices. The

plea agreement provided that, in exchange for his truthful testimony, Martin would receive a sentence ranging from 163 to 244.5 months.[1] The plea agreement had the effect of reducing Martin's presumptive sentence by 25 to 50 percent.

The day after the killing, Greenleaf left Duluth to attend a weekend pow wow on the Red Lake Reservation. Just two days later, on August 31, 1996, reservation authorities arrested Greenleaf for an alcohol violation. Carlton County authorities had informed the law enforcement agencies in the area that Greenleaf was wanted in connection with a murder investigation in Carlton County. Pursuant to that notice, Carlton County authorities were notified that Greenleaf had been arrested and two officers immediately drove to the Red Lake police station to interview him. At about 2 a.m. on September 1, 1996, approximately five hours after he was arrested, the Carlton County officers gave Greenleaf a *Miranda* warning and began interrogating him. Greenleaf initially denied having had any part in, or any information regarding, Antonich's murder. Greenleaf then asked to speak to an attorney and the interrogation stopped.

A short time later, a Red Lake officer, following tribal practices, asked Greenleaf whether he was willing to waive extradition. Greenleaf indicated that he would be willing to do so. The Red Lake officer, while preparing the waiver of extradition form, asked a Carlton County officer to identify the offense Greenleaf would be charged with in Carlton County. The Carlton County officer informed Greenleaf and the Red Lake officer that the charge was second-degree murder and this information was then typed on the waiver form. Greenleaf, who later claimed he was intoxicated during this sequence of events, then signed the waiver form even though he had not yet spoken with an attorney and no warrant had been issued for his arrest. The Carlton County officers then left the Red Lake reservation.

Several hours later, a Red Lake officer again informed Greenleaf that he did not have to waive extradition and also informed him that he could, instead, appear in tribal court. Greenleaf again indicated that he wanted to waive extradition, stating that he wanted to return to Carlton County. Greenleaf then asked to talk to Carlton County authorities.

Carlton County officers were notified that Greenleaf had requested a meeting and returned to the Red Lake police station. At approximately 6:30 p.m. on September 1, 1996, the Carlton County officers once again read Greenleaf a *Miranda* warning. This time, Greenleaf waived his rights and admitted that he had been involved in Antonich's murder, describing in detail how it occurred and leading the officers to the site of the murder. Greenleaf told the officers that he was drunk and that, after the initial assault, he was ordered to participate by John Steven Martin.

On appeal, Greenleaf argues that the trial court made numerous errors and that he is entitled to a new trial. First, Greenleaf claims that his waiver of extradition was illegally obtained in violation of his Fifth Amendment right to counsel, and that his subsequent statements to police should be suppressed. Second, he claims that the waiver of extradition was invalid because there was no warrant for his arrest as required by tribal law. Third, he challenges the indictment and the grand jury proceedings. Fourth, he claims that it was improper to join his trial with the trial of DeVerney. Fifth, he claims that the trial court erred by allowing the state to use its peremptory strikes to remove two Native Americans from the jury pool, and by allowing DeVerney to use his peremptory strikes to remove several women from the jury pool. Sixth, he claims that the trial court erred by admitting Antoine Bellanger's out-of-court statement that, after returning to Duluth following Antonich's murder, Greenleaf held up his bloody fist and said he had "already beaten someone up that night." Seventh, he claims that the trial court erred by allowing several witnesses to testify directly from documents

---

**1.** Under the Minnesota Sentencing Guidelines, with a criminal history score of 1, the presumptive sentence for aiding and abetting second-degree intentional murder is 326 months. Minn. Sent. Guidelines IV.

which were not admitted into evidence. Eighth, he argues that the trial court erred by not allowing expert testimony regarding his intoxication and duress defenses, and by not admitting reverse-*Spriegl* evidence of a crime John Steven Martin committed a year after Antonich's murder. Finally Greenleaf argues that the cumulative effect of numerous other errors requires that he be granted a new trial.

## I.

 We first address whether Greenleaf's waiver of extradition was illegally obtained in violation of his Fifth Amendment right to counsel. If the waiver was illegally obtained, Greenleaf argues that his subsequent statements to police should have been suppressed. *See Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that statements obtained in violation of *Miranda* will not be admitted into evidence).

In *Edwards v. Arizona,* the United States Supreme Court held that "an accused, * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The Supreme Court has defined "interrogation" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

 Greenleaf contends that his Fifth Amendment right to counsel was violated when a Red Lake officer asked if he wanted to waive extradition after Greenleaf had asked to speak with an attorney and before this request was granted. This argument fails for two reasons. First, asking Greenleaf whether he wanted to waive extradition was not an "interrogation" under *Rhode Island v. Innis,* because it is highly unlikely that asking someone whether they want to waive extradition would elicit an incriminating response.[2] Such questions and comments are more analogous to routine booking questions and statements which do not require *Miranda* warnings. *See State v. Widell,* 258 N.W.2d 795, 797 (Minn.1977) (holding that "*Miranda* warnings need not be given before asking routine booking questions"); *State v. Link,* 289 N.W.2d 102, 107 (Minn.1979) (holding that "[b]iographical questions are not proscribed by *Miranda*"). Second, and more importantly, the statement Greenleaf now seeks to suppress was obtained only after Greenleaf requested to speak with Carlton County police, and only after he was given another *Miranda* warning and waived his rights. Greenleaf's argument that no warrant existed at the time he signed the extradition waiver is of no effect because even an illegal arrest in violation of an extradition treaty does not preclude criminal prosecution. *See United States v. Alvarez–Machain,* 504 U.S. 655, 656, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992), *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

## II.

We turn next to Greenleaf's argument that his conviction should be set aside and the indictment dismissed because of procedural and substantive irregularities in the grand jury proceedings.[3]

---

**2.** We also note that Greenleaf's waiver of extradition process was in an Indian Tribal Court proceeding and, according to the Supreme Court, such proceedings are outside the scope of the Fifth Amendment. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56–57, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) *(citing Talton v. Mayes,* 163 U.S. 376, 384, 16 S.Ct. 986, 41 L.Ed. 196 (1896) (stating that the Fifth Amendment did not operate upon "the powers of local self-government enjoyed" by Indian tribes)). Therefore, because the murder interrogation conducted by Carlton

County police officers was separate from the discussion Greenleaf had with Red Lake police officers regarding extradition, Greenleaf did not have the right he now claims was violated when he was asked by Red Lake officers to waive extradition.

**3.** Many of these same issues were raised and properly decided in *State v. Martin,* 567 N.W.2d 62 (Minn.App.1997), *pet. for rev. denied* (Minn., Sept. 18, 1997).

A grand jury proceeding is not a trial on the merits and jurors do not determine guilt or innocence but determine if there is probable cause to believe the accused has committed a particular crime. *See State v. Inthavong,* 402 N.W.2d 799, 801 (Minn. 1987). A presumption of regularity attaches to the indictment and it is a rare case where an indictment will be invalidated. *See id.* Because of this presumption, a criminal defendant bears a heavy burden when seeking to overturn an indictment. *See State v. Scruggs,* 421 N.W.2d 707, 717 (Minn.1988). This burden is made even heavier when, as here, the defendant has been found guilty beyond a reasonable doubt following a fair trial. *See id.*

An indictment should be dismissed if the prosecutor knowingly engaged in misconduct that substantially influenced the grand jury's decision to indict and if a reviewing court gravely doubts that the decision to indict was free of any influence of the misconduct. *See State v. Montanaro,* 463 N.W.2d 281, 281 (Minn.1990); *State v. Moore,* 438 N.W.2d 101, 104–05 (Minn.1989) (stating that a prosecutor's failure to disclose exculpatory evidence to the grand jury will require dismissal of the indictment if the evidence would have materially affected the grand jury proceeding). The effect of the prosecutor's misconduct on the grand jury proceedings must be judged after looking at all of the evidence received by the grand jury. *See State v. Olkon,* 299 N.W.2d 89, 106 (Minn.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).

Greenleaf asserts that five procedural irregularities or substantive errors occurred that tainted the grand jury proceedings. First, he argues that the prosecutor violated Minn. R.Crim. P. 18.05 by submitting 16 hours of audio tapes without first playing them to the grand jury. This argument is without merit. Rule 18.05 requires that a verbatim record be made of all evidence presented to the grand jury. Minn. R.Crim. P. 18.05, subd. 1. The purpose of Rule 18.05 is served, however, by maintaining a copy of all exhibits, including the tapes, received as evidence by the grand jury. Of course, no transcript was made of the grand jury's five hours of deliberations and thus there is no record as to whether the grand jury listened to any of the tapes. Even if the grand jury listened to portions of the tapes Greenleaf believes were inadmissible, the indictment would not be dismissed because it is supported by sufficient admissible evidence to clearly establish probable cause. *See* Minn. R.Crim. P. 18.06, subd. 2; *State v. O'Dell,* 328 N.W.2d 730, 731 (Minn.1983) (holding that this court will not dismiss an indictment if the grand jury heard sufficient admissible evidence to support it). Greenleaf has the tapes and, thus, an adequate record of the information presented to the grand jury; Rule 18.05 does not require that a transcript be made of the audio tapes.

Greenleaf also argues that the indictment should be dismissed because inadmissible and prejudicial evidence was presented to the grand jury, including the uncorroborated statements of codefendants [4] as well as evidence that a codefendant had discussed killing someone else a short time before the Antonich murder. The fact that grand jurors may have heard inadmissible evidence is not sufficient to dismiss an indictment if there is sufficient admissible evidence to establish probable cause. *Id.* While Greenleaf presents a list of evidence he claims is inadmissible, he fails to demonstrate that there was insufficient admissible evidence to establish probable cause for the indictment.

Greenleaf next argues that it was improper to join five defendants in one grand jury proceeding, citing *Bruton v. United States,* 391 U.S. 123, 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that a defendant's right of confrontation is violated when

---

4. While an accomplice's uncorroborated testimony will not support a conviction, there is no such rule regarding the sufficiency of the evidence to support probable cause to indict. *See* Minn.Stat. § 634.04 (1998) (stating that "[a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.").

a nontestifying codefendant's confession implicating the defendant is received in evidence), as support for the proposition. *Bruton*, however, involved an accused's right to confront witnesses at a jury trial. *Id.* A suspect has no right to be present throughout a grand jury proceeding, much less the right to confront each witness testifying at a grand jury proceeding. *See* Minn. R.Crim. P. 18.04.

We have carefully considered and find no merit to Greenleaf's arguments that the prosecutor (1) misled the grand jurors regarding their duty in returning an indictment; (2) failed to present exculpatory evidence; (3) prevented the jury from considering all relevant charges; (4) failed to ensure that prejudicial media coverage of the case did not jeopardize the impartiality of the process; (5) engaged in improper discussions about trial outcomes and penalties; and (6) repeatedly told the grand jury he had already charged Greenleaf with murder in the second degree.

### III.

■ Greenleaf next argues that the trial court erred when it joined for trial his case and DeVerney's and, as a result, he suffered substantial prejudice.[5] Greenleaf contends that the evidence of prior crimes committed by DeVerney and of letters written by DeVerney to Aubid while awaiting trial was so prejudicial that it was impossible for the jury to consider such evidence only as to DeVerney.

The amended version of Minn. R.Crim. P. 17.03, subd. 2(1), provides:

> When two or more defendants are jointly charged with a felony, they may be tried separately or jointly *in the discretion of the court.* In making its determination on whether to order joinder or separate trials, the court shall consider the nature of the offense charged, the impact on the victim,

the potential prejudice to the defendant, and the interests of justice.

(Emphasis added.)

The nature of the crime involved here is identical, as is the involvement of Greenleaf and DeVerney. Neither pulled the trigger, but both admitted almost identical roles in the assault, kidnap and murder, and in the attempt to hide any evidence that would link them to the crime. We have held that joinder is proper when two defendants act in close concert with one another. *See Strimling*, 265 N.W.2d at 432. The identical nature of the charged offenses and the nearly identical evidence against each defendant supports the trial court's decision to join Greenleaf and DeVerney for trial. Moreover, the trial court instructed the jury at the beginning and end of the trial that the cases were to be considered separately and that evidence regarding DeVerney's prior crimes and correspondence with Aubid was to be considered only as to DeVerney. *See State v. James*, 520 N.W.2d 399, 405 (Minn.1994) (holding that if the evidence and the instruction are neither complex nor confusing, it must be presumed that the jury understood and followed the court's instruction). The trial court also properly redacted from each codefendant's statements any reference to the other codefendant. *See* Minn. R.Crim. P. 17.03, subd. 3(2).

Greenleaf has also failed to establish that he suffered substantial prejudice, suggesting only that each defendant chose a different defense: Greenleaf claimed intoxication, duress, and that he was innocent, while DeVerney simply claimed he was innocent. However, these defenses did not conflict and the jury was not forced to choose between the testimony of DeVerney or the testimony of Greenleaf to arrive at its verdicts. Instead, the jury was asked to choose between the state's theory of the case and each defendant's theory of the case. Therefore, Greenleaf did not suffer substantial prejudice when

---

5. To support his position, Greenleaf cites cases decided under the 1975 version of Minn. R.Crim. P. 17.03, subd. 2(1). Under this rule, defendants jointly charged with a felony were to be tried separately, unless the trial court, in the interests of justice and not solely related to economy of time or expense, orders joinder. *See State v.*

*Hathaway*, 379 N.W.2d 498, 502 (Minn.1985); *State v. Eaton*, 292 N.W.2d 260, 265 (Minn. 1980); *State v. DeFoe*, 280 N.W.2d 38, 40 (Minn. 1979); *State v. Strimling*, 265 N.W.2d 423, 431 (Minn.1978). The 1975 rule strongly favored separate trials. *See State v. Swenson*, 301 Minn. 199, 201, 221 N.W.2d 706, 708 (1974).

the trial court ordered a joint trial. *See Hathaway*, 379 N.W.2d at 503 (stating that no substantial prejudice occurred where defendants did not present inconsistent defense theories and did not seek to shift blame to the other).

In addition, joint trials were clearly in the interests of justice because a majority of the prospective witnesses scheduled to appear in these cases lived in northeastern Minnesota and would have been required to drive two to four hours to testify in each trial. Therefore, we conclude that Greenleaf did not suffer substantial prejudice when the trial court ordered a joint trial.

## IV.

 We next consider Greenleaf's argument that the trial court erred by allowing the state to use its peremptory strikes to remove two Native Americans from the venire, and by allowing DeVerney to use his peremptory strikes to remove several women from the venire. The use of peremptory challenges to exclude persons from the jury solely on the basis of either race or gender is prohibited by the Equal Protection Clause of the United States Constitution. *See Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (prohibiting peremptory challenges based solely on race); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–31, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending the prohibition in *Batson* to include peremptory challenges based solely on gender).

 In *Batson*, the Supreme Court established a three-step process to determine whether a peremptory challenge is motivated by a prohibited discriminatory intent. *See Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. First, the defendant must make a prima facie showing that the challenge was exercised on the basis of either race or gender. *See id.* at 96, 106 S.Ct. 1712 (race); *J.E.B.*, 511 U.S. at 130–31, 114 S.Ct. 1419 (gender). We have stated that "[a] prima facie case of racial [or gender] discrimination is established by showing that one or more members of a racial group [or gender classification] have been peremptorily excluded from the jury and that circumstances of the case raise an inference that the exclusion was

based on race [or gender]." *State v. Stewart*, 514 N.W.2d 559, 563 (Minn.1994).

Second, once a prima facie showing has been made, the burden shifts to the prosecutor to articulate a race- or gender-neutral reason for the challenge. *See Batson*, 476 U.S. at 97, 106 S.Ct. 1712. We have stated that the explanation provided by the prosecutor does not have to be "valid" in the sense of establishing a reasonable basis for challenge, but must instead be race- or gender-neutral depending on the challenge. *See State v. McRae*, 494 N.W.2d 252, 254 (Minn.1992). This second step "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race [or gender] neutral." *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

 Finally, if the prosecutor successfully establishes a race- or gender-neutral reason for the challenge, the trial court must then determine whether there has been purposeful discrimination. *See Batson*, 476 U.S. at 98, 106 S.Ct. 1712; *State v. Gaitan*, 536 N.W.2d 11, 15–16 (Minn.1995). If the basis for the challenge given by the prosecutor is one that will result in the disproportionate exclusion of members of a certain race or gender, the trial court may consider this as one of the relevant circumstances bearing on the determination of whether the facially-valid reason given by the prosecutor is a pretextual explanation offered to mask a discriminatory intent. *Hernandez*, 500 U.S. at 362–66, 111 S.Ct. 1859. However, considerable deference must be given by a reviewing court to the trial court's finding on the issue of intent because the finding typically will turn largely on an evaluation by the trial court of credibility. *See id.* at 366–69, 111 S.Ct. 1859. If a prosecutor had a prohibited discriminatory intent or motive for striking a juror, a defendant is automatically entitled to a new trial because harmless error impact analysis is "inappropriate in the case of a defendant convicted by a petit jury if there

was racial discrimination in the selection of that jury." *McRae*, 494 N.W.2d at 260.

In this case, because Greenleaf was a Native American and both prospective Native American jurors were struck, a prima facie case was established. The prosecutor, however, met his burden under the second step of the *Batson* analysis by articulating race-neutral reasons for the challenges.

As to the first Native American struck, those race-neutral reasons included the juror's negative feelings toward government and law enforcement in particular, her sympathy for a brother in prison for criminal sexual misconduct, her feud with a sister employed as an attorney by the state, her admission that she held views that were "different," and her view that numerous assaults against her family members were "not serious," even though bones had been broken. As to the second Native American struck, the prosecutor's race-neutral reasons included the juror's admitted sympathy towards the defendants, the juror's acquaintance with Red Lake community members, some of whom were potential witnesses, the fact that the juror's wife was on probation for welfare fraud, and the juror's prior conviction for driving under the influence of alcohol.

As to the third step in the *Batson* analysis, the trial court determined that the defense failed to meet its burden of proving purposeful discrimination. There is nothing in the record to indicate that such a finding was clearly erroneous since the reasons provided by the state for each excluded juror provided ample, nonrace-based justifications for the peremptory strikes. *See Batson*, 476 U.S. at 89, 106 S.Ct. 1712 (holding that a prosecutor may exercise a peremptory challenge " 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried") (citation omitted); *see also State v. Scott*, 493 N.W.2d 546, 549

(Minn.1992) (upholding the use of a peremptory strike on a potential juror who answered, "probably, yeah," when asked whether she could follow the judge's instruction).

 Greenleaf also argues that he was prejudiced because DeVerney's peremptory challenges were based solely on gender.[6] It is true that several women were peremptorily struck by DeVerney. However, the first two jurors selected were women, and a total of six women, including alternates, were seated on the jury. The trial court correctly concluded that Greenleaf failed to meet the first step in the *Batson* analysis because he failed to make a prima facie showing that the challenges made by DeVerney were exercised on the basis of gender.

## V.

We turn next to the issue of whether the trial court erred by allowing Mike Martin to testify and, if not, whether the trial court erred by not permitting the defense to cross-examine Martin about the number of months his presumptive sentence was to be reduced pursuant to his plea agreement.

### A. Martin's testimony

 The decision to allow an accomplice to plead guilty to a lesser crime if he provides truthful information and testimony is a proper exercise of a prosecutor's authority. *See State v. Jones*, 392 N.W.2d 224, 232 (Minn.1986) (citing A.B.A. Standards for Criminal Justice, The Prosecution Function, Standard 3–3.9(b)(vi)). "Such negotiations do not necessarily make an accomplice's testimony so unreliable that it must be excluded from evidence, for they in no way bind the witness' testimony; he or she is free to testify truthfully and fully without fear of repri-

---

6. As a preliminary matter, Greenleaf cannot challenge the peremptory strikes made by his codefendant because peremptory challenges belong to a "side," not an individual. *See United States v. Boyd*, 86 F.3d 719, 723 (7th Cir.1996) (stating that "[w]hen there is more than one defendant, the court may require the defendants to exercise their challenges collectively, which is incompatible with the idea that challenges are personal, non-delegable choices."). The implica-

tion of allowing codefendants to make such a challenge would be that each codefendant could make discriminatory peremptory challenges and then, if they were found guilty, each could appeal and get a new trial based on the other codefendant's improper peremptory challenge. *See United States v. Huey*, 76 F.3d 638, 642 (5th Cir.1996) (Jolly and Duhe, JJ., concurring) (stating that the *Huey* decision will undermine public trust in the criminal justice system).

sals on the part of the government." *See Jones,* 392 N.W.2d at 232.

Greenleaf argues that the state improperly induced Martin to testify because the plea agreement, according to Greenleaf, made reduction of sentence dependent upon how well Martin testified. The plea agreement, however, clearly provided that Martin was only required to testify truthfully at each trial and that, in exchange for his truthful testimony, he would receive a sentence ranging from 163 to 244.5 months. The plea negotiations in this case did not condition the sentence upon the successful prosecution of accomplices, and the plea agreement was not an inducement to commit perjury. Further, the trial court instructed the jury that it could not find appellant guilty based on Martin's testimony "unless that testimony is corroborated by other evidence which tends to convict the defendant of the crime." Therefore, the trial court did not err by allowing Martin to testify.

**B. Right of confrontation**

▮▮▮▮ Greenleaf also contends that the trial court violated his Sixth Amendment right of confrontation by not allowing Martin to be cross-examined about the exact number of months his sentence could be reduced under the plea agreement. The trial court, while prohibiting Greenleaf's counsel from asking about the exact number of months Martin's sentence could be reduced, did not prohibit Greenleaf from cross-examining Martin regarding every other aspect of the plea agreement, including the percentages by which Martin's sentence could be reduced. As the Supreme Court held in *Kentucky v. Stincer,* "the Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)). The trial court was properly concerned that a recitation of the number of months of confinement Martin could serve might mislead the jury regarding the number of months another defendant, if convicted,

might be confined. It is for the court to sentence, and not the jury, and thus the court, by allowing the jury to only know the percentages of the plea agreement, properly prevented the jury from speculating about possible sentences. Therefore, the trial court did not err by denying Greenleaf's counsel the right to cross-examine Martin regarding the specific number of months Martin's sentence could be reduced pursuant to plea agreement.

**VI.**

The next issue is whether the trial court erred by allowing an investigator to testify regarding the out-of-court statement of Antoine Bellanger. According to the investigator, Bellanger, who failed to appear to testify at trial after being served with a subpoena, saw Greenleaf at Bellanger's sister's house on August 28, 1996, the night of Antonich's murder. While there, Bellanger witnessed a confrontation between John Steven Martin and two men he did not know. During this confrontation, Greenleaf held up his bloody fist and said that he had "already beaten up somebody that night." The investigator also testified that Bellanger saw Greenleaf the next morning with the other four defendants and that they all stopped talking when Bellanger entered the room.

▮▮▮▮ Out-of-court statements are inadmissible unless they qualify under an exception to or exclusion from the hearsay rule. *See* Minn. R. Evid. 804. Such statements are also inadmissible if the constitutional confrontational rights of the accused are violated. *See Ohio v. Roberts,* 448 U.S. 56, 62–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *State v. Hansen,* 312 N.W.2d 96, 102 (Minn.1981). In determining whether an accused's confrontational rights have been violated, we apply the two-step analysis suggested by the Supreme Court in *Roberts. See Hansen,* 312 N.W.2d at 102. Under this analysis, the trial court must first address the necessity of the admission of the hearsay declaration. *See id.* This requirement can be met by showing the declarant is unavailable to testify at the trial. *See* Minn. R. Evid. 804(a)(5). In this case, Bellanger was unavailable because he failed

to appear and could not through reasonable means be made to appear. *See id.*

The second requirement is that the statements bear sufficient "indicia of reliability." *See Hansen,* 312 N.W.2d at 102. Statements which are made under oath and subject to cross-examination may be sufficiently reliable to protect the values associated with the Confrontation Clause. *See, e. g., Roberts,* 448 U.S. at 70–72, 100 S.Ct. 2531; *California v. Green,* 399 U.S. 149, 165, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). However, unsworn, ex parte statements made during police questioning have traditionally been considered inherently untrustworthy. *See United States v. Sarmiento–Perez,* 633 F.2d 1092, 1102–03 (5th Cir.1981). Indeed, the purpose of the Confrontation Clause is to prohibit these *ex parte* declarations from being introduced at trial. *See Green,* 399 U.S. at 156, 90 S.Ct. 1930; *State v. Olson,* 291 N.W.2d 203, 206 (Minn.1980) (stating that because of their unreliability, the admission of such statements may result in a denial of a defendant's constitutional right to confront the witnesses against him).

The trial court admitted Bellanger's statement under the catch-all exception to the hearsay rule, Minn. R. Evid. 804(b)(5), finding that the statement was reliable because (1) Bellanger was not in custody when he made the statement to police; (2) Bellanger was never a suspect in the case; (3) Bellanger did not seek out the police in making his statements but instead made the statements spontaneously when police questioned him; (4) there was no motive for Bellanger to fabricate the statements; and (5) his statements were corroborated by other evidence. We disagree. While Bellanger's statement was corroborated by other evidence, under the Supreme Court's holding in *Idaho v. Wright,* particularized guarantees of trustworthiness must be "drawn from the totality of the circumstances that surround the making of the statement and that render

the declarant particularly worthy of belief." 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). "In other words, if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Id.* at 818, 110 S.Ct. 3139.

Bellanger's testimony was not so trustworthy that cross-examination would have been of marginal utility. Cross-examination would have helped reveal Bellanger's motivations and trustworthiness. Therefore, allowing an investigator to testify as to what Bellanger told him was error. If the verdict rendered is "surely unattributable" to the error, then the error is harmless beyond a reasonable doubt and the conviction stands.

However, because the verdict rendered was "surely unattributable to the error, the error is harmless beyond a reasonable doubt." *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997) (internal quotations omitted). In fact, Bellanger's statement was not necessary to prove that Greenleaf had a bloody fist from beating someone that evening. An eyewitness testified that she saw Greenleaf reach in and strike Antonich through his car window. Bellanger's testimony only corroborated the testimony of the eyewitness. Furthermore, Greenleaf told police that he "could have" struck Antonich and that such a blow could have been the reason why a cut on his fist had been reopened. In addition, Greenleaf's blood was found in Antonich's car. Therefore, while the statement should not have been admitted, its admission was harmless beyond a reasonable doubt.

## VII.

Greenleaf also argues that the trial court erred by allowing witnesses to testify from transcripts of taped statements that were not admitted into evidence.[7] At trial,

---

7. The statements were not admitted into evidence because Greenleaf was not furnished with a copy within a reasonable time. *See* Minn.Stat. § 611.033 (1998) (providing that "[a] statement, confession, or admission in writing shall not be received in evidence in any criminal proceeding

against any defendant unless within a reasonable time of the taking thereof the defendant is furnished with a copy thereof * * * ."). Therefore, the trial court found that, under the rules of evidence, the documents could only be used to

several officers referred to the transcripts while testifying and appeared at times to be reading directly from them. This is error. However, because the verdict actually rendered was surely unattributable to the error, the error is harmless beyond a reasonable doubt. *See Juarez,* 572 N.W.2d at 292; *see also State v. Swanson,* 498 N.W.2d 435, 439 (Minn.1993) (stating that such an error "is harmless * * * when no constitutional right was violated, another more damaging confession was properly admitted, and the officer could have orally provided the same evidence by using the tape as a refreshing memorandum").

## VIII.

Greenleaf next argues that the trial court infringed upon his right to present a meaningful defense when it did not allow Greenleaf's expert witnesses to testify regarding his defenses of duress and intoxication, and also when the trial court excluded evidence that John Steven Martin had committed a sexual assault while awaiting trial for Antonich's murder. The Sixth and Fourteenth Amendments of the United States Constitution and Article I, section 7 of the Minnesota Constitution guarantee criminal defendants the right to present a meaningful defense. *See* U.S. Const. amends. VI, XIV; Minn. Const. art. I, § 7; *Crane v. Kentucky,* 476 U.S. 683, 687, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *State v. Richards,* 495 N.W.2d 187, 191 (Minn.1992).

### A. Expert Testimony

The admissibility of expert testimony has generally rested in the discretion of the trial court and will not be reversed absent clear error. *See State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995). Under Minn. R. Evid. 702, an expert witness may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702.

Greenleaf sought to have two experts testify at trial, one regarding his claim that he was under duress during the commis-

sion of the crime, and the other regarding his claim that he was intoxicated during the commission of the crime. The testimony of both experts would only have been in regard to the general effects of alcohol and the general effects of duress. The trial court, citing Minn. R. Evid. 702 and our prior cases, did not allow the experts to testify, concluding that the jurors did not need expert testimony to understand either defense and therefore such testimony would not assist the jury "to understand the evidence or to determine a fact in issue." *Id.; see also State v. Provost,* 490 N.W.2d 93, 103 (Minn.1992) (stating that "expert opinion testimony regarding the general effects * * * of intoxication is ordinarily inadmissible because most jurors have some experience with these conditions") *cert. denied,* 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993); *State v. Griese,* 565 N.W.2d 419, 425 (Minn.1997) (stating that because most jurors have some experience with mental illness and intoxication, expert psychiatric testimony as to the effects of those conditions is generally inadmissible).

The trial court also determined that the expert testimony would have invaded the jury's province by influencing its determination of whether Greenleaf was so intoxicated that he was unable to form the specific intent, or whether he was indeed acting under duress. *See State v. Hoffman,* 328 N.W.2d 709, 717 (Minn.1982) (stating that only a jury can decide whether the defendant possessed the requisite capacity to commit the crime charged). The trial court did not commit clear error by determining that the proffered expert testimony invaded the exclusive province of the jury and, also, that the jury would not have been aided by this expert testimony.

### B. Reverse *Spriegl* Evidence

Absent a clear abuse of discretion, evidentiary rulings generally rest within the trial court's discretion. *See State v. Glaze,* 452 N.W.2d 655, 660 (Minn.1990). A defendant who claims the trial court erred in admitting evidence bears the burden of showing the error and any resulting prejudice. *See State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994).

refresh a witness' memory. *See* Minn. R. Evid. 612.

Pursuant to Minn. R. Evid. 404(b), a defendant may seek to introduce evidence of other crimes or misconduct of a third person to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn. R. Evid. 404(b). In *State v. Deans,* we stated:

> If * * * the conduct of a third party * * * is an issue and if the evidence of "other crimes, wrongs, or acts" by the third party is not offered to prove the third party's character as a basis for an inference as to his conduct but instead is offered to prove the conduct of the third party without any need to infer his character, then the evidence is admissible.

356 N.W.2d 674, 676 (Minn.1984).

■ Such evidence, however, often referred to in Minnesota as *Spreigl* evidence after our decision in *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965), shall not be admitted in a criminal prosecution unless: (1) the evidence is clear and convincing that the person participated in the other offense; (2) the *Spreigl* evidence is relevant and material to the case; and (3) the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice. *See State v. Bolte,* 530 N.W.2d 191, 197 (Minn.1995) (detailing procedural requirements and safeguards governing other-crime evidence); *see also State v. Landin,* 472 N.W.2d 854, 859 (Minn.1991).

■ Greenleaf sought to introduce evidence of John Steven Martin's conviction for sexually assaulting a cellmate a year after the Antonich murder. Greenleaf argued that it was evidence tending to prove Martin's propensity to engage in violent, coercive behavior toward others. However, as the trial court correctly noted, this evidence fails to meet the second element of the *Spreigl* analysis because it is not relevant and material to the charged crime. To be "relevant and material," the other crime must be sufficiently similar to the charged crime in terms of time, place or modus operandi. *See State v. Wermerskirchen,* 497 N.W.2d 235, 240 (Minn. 1993). While absolute similarity between the *Spreigl* incident and the charged offense is not required, see *Landin,* 472 N.W.2d at 860, the greater the similarity between the

*Spreigl* incident and the crime charged, the greater the likelihood that the *Spreigl* incident is relevant. *See State v. Rainer,* 411 N.W.2d 490, 497 (Minn.1987).

In this case, the *Spreigl* incident is distinctly dissimilar to the murder of Antonich. First, the sexual assault by John Steven Martin occurred almost a year after Antonich's murder. *See State v. Cogshell,* 538 N.W.2d 120, 124 (Minn.1995) (holding that an offense committed 15 months earlier was "not closely related to the crime charged in temporal terms"). Second, the sexual assault occurred while John Steven Martin was confined in a prison cell and involved a fellow inmate, while Antonich's murder occurred on a deserted road in front of four witnesses. And third, there was no similarity between the events in terms of modus operandi. In Antonich's murder, according to Greenleaf, John Steven Martin used coercion to force the other four defendants to help him beat Antonich, kidnap him, commandeer his vehicle, and then kill him. In the sexual assault John Steven Martin did not use coercion to force another to commit a crime; he alone committed the sexual assault on a fellow inmate. *See Cogshell,* 538 N.W.2d at 123–24 (stating that a *Spreigl* incident must be "sufficiently or substantially similar to the crime charged"). The only similarity between the two crimes is that John Steven Martin has a propensity to commit crimes, something that cannot be proven using *Spreigl* evidence. *See Deans,* 356 N.W.2d at 676. Accordingly, the trial court did not abuse its discretion in excluding the evidence.

### IX.

■ Finally, Greenleaf argues that the cumulative effect of 10 separate errors by the trial court deprived him of his right to due process. However, the constitutional right to a fair criminal trial does not guarantee a perfect trial, *see State v. Billington,* 241 Minn. 418, 427, 63 N.W.2d 387, 392–93 (1954), and in this case none of the supposed errors raised by Greenleaf deprived him of a fair trial.

■ First, the trial court's instruction to defense counsel to "please be more re-

spectful" of an expert witness was at most, in the words of the trial court, a "mild admonition," which does not warrant a new trial. Second, when Mike Martin volunteered testimony, earlier ruled inadmissible, that Aubid pointed a gun at a laundromat, the trial court granted a motion to strike the testimony and directed the jury to disregard it. Even if inadmissible, the testimony was not harmful to Greenleaf and its admission does not warrant a new trial.

■ In addition, Greenleaf argues that, since the state accused him of making gestures to Mike Martin while Martin testified, the trial court should have conducted a hearing to determine whether in fact the jury saw the gestures and formed some adverse impression from them. The trial court instead chose to warn Greenleaf, outside the presence of the jury, about what it called, "at best * * * an ambiguous gesture." The trial court was in the best position to determine what impact any gesture may have had. Therefore, it was not an abuse of discretion to deny Greenleaf's motion for a hearing concerning his own questionable conduct.

■ Greenleaf also argues that Mike Martin was nonresponsive on cross-examination and that the court failed to take any action to correct the problem. This statement simply is not accurate. The trial court in fact sustained Greenleaf's objections to answers he felt were nonresponsive. In addition, there is no merit to Greenleaf's argument that the court did not do enough to cure a problem his own counsel created. While Greenleaf's counsel was reading Mike Martin's plea agreement he stated the exact number of months Mike Martin faced for his role in the crime, even though he knew the trial court had prohibited him from doing so. The trial judge halted the proceedings and met with the lawyers in chambers. Upon returning, the trial judge told the jury that what had transpired was a misunderstanding and that they should disregard it. Such an instruction was sufficient to keep the jurors from forming an adverse impression of either side.

■ Greenleaf also argues that the state's closing argument contained improper statements. In his closing argument, the prosecutor stated:

Ladies and gentlemen of the jury, the final test of the quality of your service is, as a jury, to do justice and one definition of justice is to do the right thing and I submit that tomorrow, a week from now, 10 years from now, you can look anyone squarely in the eye and say I did the right thing. I convicted Lester Greenleaf.

While this type of statement comes close to detracting from the role of the jury—which is to dispassionately determine whether the state has met its burden of proving that the defendant committed the crime beyond a reasonable doubt—the statements were not so prejudicial as to require a reversal of Greenleaf's conviction. *See State v. Salitros,* 499 N.W.2d 815, 819–20 (Minn.1993).

■ Greenleaf's final three arguments: (1) that the state committed discovery violations by failing to give him a copy of the "final" autopsy report and a police computer printout used by a witness during trial; (2) that spectators displayed emotional reactions during the playing of a crime scene videotape; and (3) that the trial court overruled defense objections to photographs without reviewing the exhibits, even if true, did not have such an impact on the proceeding so as to require a new trial. The trial court found that the prosecution produced every report it received from the medical examiner and that the state did not receive this "final" report. There was also no dispute as to the injuries Antonich suffered. In addition, Greenleaf was permitted to extensively cross-examine the coroner regarding any and all changes from the original report. As to the police report, which documented the time Duluth police responded to the scene of the reported car accident, Greenleaf declined to accept the trial court's remedy of allowing him time to interview the testifying officer and then recall him. Regardless, such an error was harmless because the evidence was not of great importance and the remaining body of evidence weighed so heavily against Greenleaf.

■ The trial court correctly rejected Greenleaf's motion for a new trial based on the reactions of spectators since it found that

nothing observable occurred. And finally, the record indicates that the photographs were properly admitted into evidence and that Greenleaf did not object to the photographs or the manner in which they were described by the officer who took them. The only objection Greenleaf makes is that the trial court did not specifically view the photographs before admitting them into evidence. However, even if the trial court did not view the photographs before admitting them, the error, if any, was not prejudicial since the photographs merely showed Antonich's car as it was found and removed from the ditch. The photographs show nothing of an inflammatory nature.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.