**STATE of Minnesota, Respondent,**

v.

**Demetrius Devell DOBBINS, Appellant.**

No. A05–320.

Supreme Court of Minnesota.

Dec. 28, 2006.

Leslie J. Rosenberg, Assistant State Public Defender, Office of the State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota State Attorney General, St. Paul, MN, Robert M.A. Johnson, Anoka County Attorney, Marcy S. Crain, Assistant Anoka County Attorney, Anoka, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

An Anoka County jury found Demetrius Devell Dobbins guilty of first-degree premeditated murder for the shooting death of Quintin Roderick Lavender. The district court sentenced Dobbins to life in prison. On direct appeal, Dobbins argues that (1) the district court erred in allowing the only African–American venireperson to be struck from serving on the jury; (2) the court violated Dobbins' Sixth Amendment right to effectively cross-examine a key state witness; (3) the court erred in not instructing the jury that Dobbins' girlfriend could have been considered an accomplice; and (4) the state's repeated misconduct denied Dobbins a fair trial. We affirm.

Around 6:30 p.m. on December 5, 2003, the Minneapolis Emergency Communications Unit received a telephone call reporting a homicide at a house in Columbia Heights. Police officers Gregory Sinn, Jason Beckett, and Lenny Austin responded to the call. Shortly after arriving at the scene, Austin obtained the telephone number from which the 911 call had been placed. Austin called this number and talked with the person who reported the homicide. This person then called back later and informed Austin that the two individuals involved in the homicide were returning to the scene of the homicide and described the two individuals to Austin. After finishing this second conversation, Austin saw two men matching the caller's descriptions walking toward the house. Austin told Sinn and Beckett that the suspects were returning to the house, and Sinn and Beckett arrested the two men when they entered the driveway. The men identified themselves as appellant Demetrius Dobbins and Myshohn King. At the time of arrest, Dobbins was carrying a small plastic convenience-store bag that contained a can of lighter fluid. Austin subsequently went to the backyard, where he entered a storage shed and found Quintin Lavender's body inside.

Later that same evening, officers from the Anoka County Sheriff's Office conducted an investigation of the crime scene. On the driveway, the officers discovered a plastic bag that contained a large can of lighter fluid and three smaller cans of cigarette-lighter-refill fluid. Inside the house, the officers found a large bloodstain on the living room carpet, bloodstains in the shape of footprints on the hallway carpet, and a bloody mop leaning against the bathroom sink. A DNA test later revealed that the blood found on the living room floor and on the shed door matched Lavender's DNA profile. The officers also found several large trash bags in the kitchen that contained blood-soaked clothes and rags, a pair of white cloth gloves, and an inflatable air mattress with bloodstains on it. The blood on the clothes matched Lavender's DNA profile. A subsequent examination of bloodstains found on the pants, shoes, and socks that Dobbins was wearing at the time of his arrest also resulted in a match with Lavender's DNA profile.

Following the issuance of a search warrant, police officers searched the home of Dobbins' cousin, Andre Coleman. In the lower-level bedroom of the Coleman home, police found a pair of blue jeans with bloodstains that matched Lavender's DNA profile. A forensic scientist also found gunshot residue on swabbings taken from Dobbins' hands and clothing.

On January 6, 2004, the Anoka County grand jury indicted Dobbins on one count of first-degree premeditated murder in violation of Minn.Stat. §§ 609.05 and

609.185(a)(1) (2004). Dobbins' trial began on October 11, 2004. Testimony at trial established that, before Lavender's death, Dobbins was staying with his girlfriend and her three-year-old daughter at the Columbia Heights house where Lavender's body was later found. Dobbins worked sporadically at several different jobs and also made money by selling marijuana. Dobbins and Lavender were casual acquaintances.

In the summer of 2003, Dobbins and his girlfriend went to downtown Minneapolis to sell marijuana. While downtown, they were with Lavender, and Dobbins gave Lavender nine bags of marijuana to sell. Each bag was worth ten dollars, and the two men agreed that Lavender would keep $30 from the sale and give Dobbins the balance. But Lavender left without giving Dobbins the $60 as agreed. Dobbins next saw Lavender about two weeks later and asked him for the $60. Lavender agreed to meet with Dobbins later that same day to give him the money, but Dobbins did not make it to the meeting and did not see Lavender again until December 5, 2003, the day of the homicide.

On December 5, 2003, Dobbins, his girlfriend, her daughter, and Dobbins' cousin, Andre, went to City Center in downtown Minneapolis, where Dobbins met Lavender and Myshohn King.[1] According to King, he met Dobbins at City Center at around 2:00 or 3:00 p.m. King said that Dobbins then saw Lavender, and Dobbins and Lavender started arguing about the money Lavender owed Dobbins. Dobbins eventually told Lavender to take a bus back to Dobbins' house in Columbia Heights with the other members of the group.

Shortly after the group arrived at Dobbins' house, Coleman arrived wearing a jogging suit and a pair of white gloves. Coleman and Dobbins went into a bedroom. Shortly thereafter, Dobbins came out of the room and told his girlfriend and Andre to go downstairs and leave, which they did. According to King, at the time of the shooting there were four people in the house: Dobbins, Lavender, Coleman, and King.

Dobbins then returned to the bedroom. After a few minutes, Coleman came out of the bedroom, stood by a wall, and loud music started to play. King testified that both he and Lavender became nervous because they did not know what was going on. After a couple of minutes, Dobbins, wearing the gloves Coleman had worn earlier, came out of the bedroom with a gun in his hand. Dobbins then shot Lavender twice. After the shooting, Coleman left the house and Dobbins moved Lavender's body and placed it in the bathtub. Dobbins then told King to help clean up the blood and King complied. King testified that he did not want to help Dobbins, but said that he was not going to "talk back" to Dobbins at that point. King cleaned up the blood in the living room while Dobbins mopped the floor in the bathroom. Dobbins put some of the used cleaning materials into a garbage bag.

About 30 minutes after the shooting and while King was still cleaning up, a young woman came into the house and Dobbins told the woman that he had shot someone. The woman then grabbed some clothes and left the house. Shortly thereafter, another young woman arrived at the house. This woman saw Lavender's body, became scared, and left.

Dobbins and King wrapped Lavender's body in an air mattress and moved the

---

1. King, who pleaded guilty to aiding Dobbins by being an accomplice-after-the-fact to Lavender's murder, testified at Dobbins' trial.

body out of the house and into a shed behind the house. Dobbins then called a taxi, and he and King rode in the taxi to Coleman's house, where they put clothes from the crime scene in the basement. Dobbins and King then walked to a nearby convenience store where Dobbins bought lighter fluid. King testified that one of the women had suggested that they burn down the house and the shed. Upon their return to the house, the police arrested Dobbins and King in the driveway.

When he was arrested, King told the police that he was in the area because he was attempting to visit a girlfriend. At trial, he admitted that he had lied to the police. King also admitted that he entered into a plea agreement with the state in exchange for testifying against Dobbins. King also acknowledged that based on his plea agreement, he "could potentially receive a 75 percent lesser sentence than [Dobbins]." According to King, the reason he was willing to cooperate was because Dobbins killed Lavender "over nothin'" and "what happened was wrong."

Dobbins' girlfriend and her sisters, Shiniqua and Thaijuana, also testified at Dobbins' trial. Dobbins' girlfriend testified that after coming back from City Center, she stayed at Dobbins' house for about 45 minutes, but left before the shooting occurred. During her testimony, she admitted that she had previously told the police she was able to hear Dobbins' side of a cell phone conversation with Coleman, and heard Dobbins say, "Bring it."

At the time of the homicide, Shiniqua and Thaijuana were both staying at Dobbins' house. According to Shiniqua, she and Thaijuana drove their children to the house in the afternoon. Dobbins met Shiniqua in the driveway and asked her not to come inside because he was cleaning up something that the children should not see. Dobbins eventually told Shiniqua that a person who owed him money was inside the house and was dead. Dobbins also told Shiniqua that he had asked Coleman to bring a gun over. At trial, Shiniqua also said that Dobbins had told her that "he shot [Lavender]" because Lavender owed him money.

Shiniqua went on to testify at trial that she did not leave after Dobbins stopped her in the driveway; instead, she went inside the house. Once inside, she saw King standing in the living room, a body in the hallway outside of the bathroom, and some blood on the living room floor and in the hallway. Shiniqua gathered up some of her clothes and other personal belongings and went outside to Thaijuana's car. Shiniqua then reentered the house with Thaijuana. This time, Shiniqua saw that the body had been wrapped in an air mattress. She also testified that Dobbins told her they were going to put the body into the shed in the back yard, and she later saw the body in the shed.

Thaijuana testified that she panicked when she entered the house and saw a body. When Dobbins and King took the body out to the shed, she followed them and saw them put Lavender's body in the shed. Thaijuana also admitted that she provided a suggestion about how to clean up the blood and told Dobbins that he could burn down the house. Thaijuana testified that when she asked Dobbins how he had killed Lavender, Dobbins told her that he turned up the volume of the music that was playing and then shot Lavender. Dobbins also told Thaijuana that Coleman brought over a gun and left with the gun soon after the shooting. Thaijuana admitted at trial that she previously told a police detective that no one had told her who was responsible for the shooting. She also testified that that she did not remember telling a 911 operator that she did not know who shot Lavender. After Lavender's

body was placed in the shed, Thaijuana went home and told her father what she had observed. Thaijuana's father called the police and put Thaijuana on the phone. She then reported the homicide.

Dobbins testified on his own behalf. He denied killing Lavender. According to Dobbins, he took Lavender to his house so that Lavender could get a ride to Lavender's cousin's home to get the money Lavender owed Dobbins. After they arrived at Dobbins' house, Dobbins called Coleman so that he could give Lavender a ride to pick up the money Lavender owed Dobbins. Dobbins said he then gave the phone to Lavender so he could call his cousin to make arrangements to pick up the money.

Shortly thereafter, Coleman arrived at the house and went into the bedroom where Dobbins was. Dobbins said he was surprised to see that Coleman had gloves on. Dobbins asked Coleman about the gloves and Coleman then lifted his shirt to reveal a gun. Dobbins testified that he asked Coleman about the gun and told him "we don't need that." Coleman then left the bedroom and went to the living room.

Dobbins testified that he stayed in his bedroom to iron some clothes and, while there, he heard a gunshot. Dobbins said he ran out into the hallway where he saw King fire a second shot at Lavender, after which Lavender rolled over and fell onto the floor. According to Dobbins, he asked Coleman "should we take 'em to the hospital?" Dobbins also thought that Lavender may have been faking, because at first he did not see any blood. Coleman wrapped the gun in a pillowcase, and after that, Coleman got a blanket and rolled Lavender's body over. Dobbins said he then saw a large pool of blood. According to Dobbins, at that point he "pretty much knew [that Lavender had been shot]." Dobbins said that he then started to get

nervous and was trying to get his belongings out of the house.

Dobbins testified that about an hour or two after the shooting, Shiniqua and Thaijuana came home and saw Lavender's body. According to Dobbins, he did not want other people to see Lavender's body, so he helped King carry it to the shed. After placing Lavender's body in the shed, Dobbins packed his belongings in some bags, called a taxi, and went with King to Coleman's house. After leaving his bags at Coleman's house, he and King walked a couple of blocks to a store and Dobbins bought some lighter fluid that he planned to use to burn his own clothes. Dobbins then walked toward his girlfriend's cousin's house so that he could call his girlfriend to tell her that he was coming by to pick her up. Dobbins denied making any remarks to Shiniqua and Thaijuana about shooting Lavender. During cross-examination, Dobbins denied that he had anything to do with Lavender's murder, stating, "to go kill somebody for $60, what's the purpose?" Dobbins also acknowledged that neither King nor Coleman knew Lavender before the day he was murdered.

On November 5, 2004, the jury found Dobbins guilty of first-degree premeditated murder. The district court then convicted Dobbins of this offense and sentenced him to life in prison. Following his conviction, Dobbins filed this direct appeal. He raises four issues on appeal: (1) whether the district court erred in allowing the only African–American venireperson to be struck from serving on the jury; (2) whether the court violated Dobbins' Sixth Amendment right to effectively cross-examine a key state's witness; (3) whether the court erred in not instructing the jury that Dobbins' girlfriend could have been considered an accomplice; and (4) whether the state's misconduct denied Dobbins a fair trial, or in the alternative, whether

defense counsel's failure to object to the misconduct constituted ineffective assistance of counsel.

## I.

█ We first consider whether the state's peremptory challenge of the only African–American venireperson was racially discriminatory and therefore constituted an equal protection violation. This issue presents a mixed question of law and fact. The existence of racial discrimination in the exercise of a peremptory challenge is a factual determination to be made by the district court and should be given great deference on review. *State v. Reiners*, 664 N.W.2d 826, 830 (Minn.2003) (citing *State v. Taylor*, 650 N.W.2d 190, 200–01 (Minn. 2002)). Because the district court is in a unique position to determine whether the circumstances of a peremptory challenge give rise to an inference of discrimination, we will reverse the court's factual determination only if there was clear error. *State v. White*, 684 N.W.2d 500, 506–07 (Minn. 2004). But a district court's legal determinations are questions of law that we review de novo. *State v. Wiernasz*, 584 N.W.2d 1, 3 (Minn.1998).

█ In *Batson v. Kentucky*, 476 U.S. 79, 96–98, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court established a three-step test to determine whether a peremptory challenge discriminates against a venireperson on the basis of race. The three-step *Batson* analysis has been incorporated into Minnesota's criminal procedure in Minn. R.Crim. P. 26.02, subd. 6a(3). Under *Batson*, to establish that one party has used a peremptory challenge to exclude persons from the jury solely on the basis of their race, the other party must make a prima facie showing that establishes an inference of discriminatory purpose based on the facts of the case. 476 U.S. at 93–94, 106 S.Ct.

1712. A prima facie case is established by showing that: (1) a member of a protected racial group has been peremptorily excluded from the jury; and (2) the circumstances of the case raise an inference that the exclusion was based on race. *State v. Taylor*, 650 N.W.2d 190, 201 (Minn.2002) (citing *State v. Stewart*, 514 N.W.2d 559, 563 (Minn.1994)).

█ After a prima facie case is established, the party seeking to use the peremptory challenge must articulate a race-neutral explanation for challenging the venireperson. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. This explanation need not be persuasive or even plausible. *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). As long as the proffered explanation is facially valid and exhibits no discriminatory intent, the reason will be deemed race neutral. *Hernandez v. New York*, 500 U.S. 352, 358–60, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

█ Finally, the district court must determine whether the objecting party has carried its burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. The Supreme Court has stated that, if a proffered reason for striking a protected venireperson applies equally to an otherwise-similar nonminority venireperson who is permitted to serve, that is evidence tending to prove purposeful discrimination. *Miller–El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). In addition, posing different voir dire questions to minority and nonminority venirepersons is also probative evidence of discriminatory intent. *Id.* at 2333–34.

Here, the record indicates that venireperson no. 181 was the only African American in the jury pool of 74 persons and was the first venireperson examined. During voir dire, venireperson no. 181 stated that her parents had done religious volunteer

work in prisons for over 26 years. In her opinion, her parents tried "to help the men, even though they [are] in a tough spot, sometimes because of decisions they [have] made."

Venireperson no. 181 stated that she had gone with her parents to visit prison inmates and had participated in prayer meetings with the inmates. She said that some inmates end up in prison because of decisions that they make, "drugs," "hanging with the wrong crowds," or being "at the wrong place at the wrong time and happen[ing] to get caught." She further stated that "maybe they were an innocent person that was just—just happened to be caught with the people that were actually the guilty parties."

Venireperson no. 181 also indicated that she had some personal experience that led her to reach her conclusions. She explained that she had some cousins with drug problems who had gotten into trouble with the law, including a cousin who got into trouble "because of some wrong choices that he had made." She said she was not sure whether her cousin was rightfully or wrongfully accused of being involved in criminal conduct or was ever convicted of a crime.

Venireperson no. 181 also stated that her sister recently received a "hefty" traffic ticket and that her sister believed she "was treated a little injustly, * * * maybe because of her color." Venireperson no. 181 explained that she felt bad for her sister because, although her sister tried to be honest, the officer issued her a ticket anyway; but venireperson no. 181 considered this "just an unfortunate part of life" and "just dismissed it." Upon further questioning, she stated that she could not make a judgment regarding whether her sister was given the ticket because of her sister's skin color. She said:

I would say no because I wasn't there and I didn't really know what happened so I really can't give an honest opinion. I shouldn't say honest opinion. But I really can't give my own opinion about that. On the flip side of that, I know my sister as well, and, of course, it has nothing to do with her skin color though. So I believe that she was honest, but I believe it was just an oversight maybe on her part. It's just an unfortunate thing. That's the best way I can describe it.

After venireperson no. 181 finished answering questions, the state exercised its first peremptory strike against her. Dobbins' counsel responded by making a *Batson* challenge, stating this venireperson was the only African American out of the 74 potential jurors, and "with the peremptory strike by the State, it's now statistically impossible that any other African–American could be impaneled on this jury." Dobbins' counsel also argued that the state "spent a high percentage of [its] questions and a high percentage of [its] time on race-related issues with [venireperson no. 181]; specifically family-related issues."

The district court responded by stating that:

Under *Batson,* one of the factors the Court is to consider is whether there's been a pattern of strikes against jurors based on race, and obviously I can't make that determination since this is the first prospective juror that's been examined. But I do have some concerns that this is the only prospective juror that is on the panel to my knowledge that is African–American, and so I do have some concerns about the race issue.

Mr. Young, assuming then that the Court will make the finding that the opponent of the peremptory challenge has established a prima facie case of

racial discrimination, do you have a race neutral explanation for the peremptory [challenge]?

The state then articulated its basis for exercising the peremptory strike. According to the state, venireperson no. 181 "clearly has sympathies for folks who have been involved in the criminal justice system." Further,

> she was articulating and talking about, oh, what their circumstances might have been or must have been, or the decisions they made. And we shouldn't have jurors who are feeling sympathy and speculating and guessing about circumstances of a particular person's plight as to why they are involved in a case.

According to the state, venireperson no. 181 had unexplained expectations of leniency for her sister and "there's certainly evidence and information in the case law that tells us that if a family member has had an experience that might be negative or have a perception of law enforcement that's not appropriate, that can be the basis for a strike." The state also noted venireperson no. 181's and her family's volunteer work. The state then said, "These are inmates. She was forming opinions about what their circumstances were and had gone on as part of these encouragement sessions or counseling services, which is great work. It just might not make the person the best to sit as a juror in a criminal case." The state went on to say,

> And it was becoming clear to the State that she had some opinions about wrongfully charged people and the role that juries play in that. And the State was becoming very concerned about if— this belief that wrongful convictions happen or questions about evidence in those things come to light, what her ability would be to base it on the facts heard in this court.

The district court concluded that the state's reasons were race-neutral and denied Dobbins' *Batson* challenge. According to the court, the state's explanation indicated that "[the state's] concern with this particular potential juror was that she had expressed opinions leading the [state] to believe that she had sympathies to those that are accused of crimes or convicted of crimes specifically based on some of her responses relating to inmates, the situation with her sister." The court further concluded that the state's peremptory strike was not based on "purposeful racial discrimination." The court also noted that there was nothing "in the demeanor or the questioning of [the state] that leads [the court] to believe that the [state] was trying to single out prospective jurors based on their race." The court said: "the [state's] questions appeared to this Court to be more directed towards learning that prospective juror's views, her philosophies if you will, and her views on the system and how it works."

■ The record shows that out of the 74 potential jurors for Dobbins' trial, venireperson no. 181 was the only African American in the jury pool. As a result, the state's successful peremptory strike of venireperson no. 181 precluded Dobbins from seating any African–American jurors. This fact, together with Dobbins' stated concern about the nature of the questions asked of venireperson no. 181, was enough for Dobbins to successfully establish a prima facie case of racial discrimination for the purpose of a *Batson* challenge.

■■ But Dobbins, as the party who opposed the peremptory strike, has to prove "purposeful discrimination" by the state once the state has provided a race-neutral reason for the strike. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712. Here, the state explained that it sought to strike this veni-

reperson because it believed that she was sympathetic to those who are accused of and had been convicted of criminal offenses. We agree with the district court that the state's reason is race-neutral on its face; thus, the question is whether the state's reason was pretextual and the challenge was actually motivated by racial discrimination. *Reiners,* 664 N.W.2d at 832. Accordingly, we must determine whether Dobbins successfully proved that the state's peremptory challenge constituted "purposeful discrimination" and whether the court committed "clear error" when it made the factual determination that the state's strike was not racially motivated. *Id.* at 833.

After examining the record, we conclude that the district court did not commit clear error when it allowed the state's peremptory challenge of venireperson no. 181. First, the state's reason for striking the venireperson is not "implausible or fantastic." *See Elem,* 514 U.S. at 768, 115 S.Ct. 1769. Second, the record indicates that, despite Dobbins' assertion that the state eliminated venireperson no. 181 based on her sympathy toward her fellow African Americans, Dobbins failed to present evidence that would support this allegation. Contrary to Dobbins' interpretation, venireperson no. 181 expressed her sympathy toward all persons who had trouble with the law, not just those who are African American. The record does not show that the state struck her as a juror solely because she was African American or, as Dobbins asserts in his brief, for her "empathy for the effect discrimination has had on [the African–American] community." Third, Dobbins was not able to establish a pattern of using peremptory challenges to exclude racial minorities from the jury. For example, there is little evidence that the state asked different questions of prospective jurors based on their race or that the state allowed prospective Caucasian jurors who provided similar answers as venireperson no. 181 to serve on the jury.

We accord great deference to a district court's factual determination of whether there is racial discrimination in the exercise of a peremptory challenge. *Taylor,* 650 N.W.2d at 200–01. Such deference is warranted because the district court is in the best position to evaluate the demeanor and credibility of the party that exercised the challenge. *See Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859. Here, the court not only clearly articulated the steps in its *Batson* analysis, but also based its lack-of-purposeful-discrimination determination on its observation that there was nothing "in the demeanor or the questioning" of the state that would indicate that the state was attempting to single out prospective jurors based on their race. Examining the court's reasoning for allowing the strike in light of the required deference to that court, we hold that the court's conclusion that Dobbins failed to prove purposeful discrimination by the state was not clearly erroneous.

Importantly, we have on numerous occasions expressed our concern about the impermissible consequences of a racially discriminatory jury selection process. *See, e.g., Angus v. State,* 695 N.W.2d 109, 114–15 (Minn.2005); *Reiners,* 664 N.W.2d at 831. As the Supreme Court has pointed out, racial discrimination in the jury selection process not only compromises a defendant's right to trial by an impartial jury, but also harms racial minorities generally by establishing "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *See, e.g., Miller–El,* 125 S.Ct. at 2323 (quoting *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 128, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994)). Further, when the government's choice of jurors is tainted with racial bias, it casts

doubt over the parties, jury, and the court's ability to adhere to the law, invites cynicism as to the jury's neutrality, and undermines public confidence in the judicial system. *Id.* at 2323–24. Although improvements have been made, we continue to be concerned about the under-representation of minority jurors in jury pools and we will continue to monitor the composition of jury pools and the jury selection process for racially discriminatory peremptory challenges.

## II.

■ We next address Dobbins' argument that the district court violated his Sixth Amendment right to effectively cross-examine a key state witness. Dobbins contends that the court erred in prohibiting him from cross-examining Myshohn King regarding the exact number of months that King's sentence would be reduced as the direct result of King's plea agreement with the state.

■ Generally, a reviewing court defers to the district court's evidentiary rulings and will not overturn the rulings absent a clear abuse of discretion. *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989) (citing *State v. Jones,* 347 N.W.2d 796, 802 (Minn.1984)). But whether the admission of certain evidence violated a defendant's confrontation right is a question of law subject to de novo review. *State v. King,* 622 N.W.2d 800, 806 (Minn.2001) (citing *Lilly v. Virginia,* 527 U.S. 116, 136, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)). In *Kentucky v. Stincer,* the Supreme Court held that "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292,

88 L.Ed.2d 15 (1985)). In *State v. Greenleaf,* 591 N.W.2d 488, 502 (Minn.1999), we concluded that it is not error for the district court to prohibit cross-examination of an accomplice regarding the specific number of months the accomplice's sentence could be reduced under a plea agreement. In so concluding, we said:

> The trial court was properly concerned that a recitation of the number of months of confinement [the testifying accomplice] could serve might mislead the jury regarding the number of months another defendant, if convicted, might be confined. It is for the court to sentence, and not the jury, and thus the court, by allowing the jury to only know [the percentage of time by which the sentence was reduced], properly prevented the jury from speculating about possible sentences.

*Id.*

Here, King pleaded guilty to aiding an offender as an accomplice-after-the-fact to Dobbins. The state made a motion in limine to prohibit Dobbins from referring to the exact number of months King's potential prison term was being reduced in exchange for his truthful testimony. The district court considered our court's holding in *Greenleaf* and ruled that Dobbins could not inquire about the exact number of months King's potential sentence was reduced, but could cross-examine about other aspects of the plea agreement, including the extent to which King was "getting a significant reduction in his potential sentence." Additionally, King admitted that he could potentially receive a 75 percent lesser sentence as a result of the plea bargain. Based on this record, we conclude that our holding and reasoning in *Greenleaf* applies to the instant case. Therefore, we hold that the district court did not err when it prohibited Dobbins from cross-examining King regarding the

exact number of months that King's sentence would be reduced as a result of King's plea agreement with the state.

### III.

 We next address Dobbins' argument that the district court committed reversible error by failing to instruct the jury that Dobbins' girlfriend may be considered an accomplice. The decision to give a jury instruction lies within the discretion of the district court and will not be reversed absent an abuse of that discretion. *See State v. Daniels*, 361 N.W.2d 819, 831 (Minn.1985) (citing *State v. Villalon*, 305 Minn. 547, 551, 234 N.W.2d 189, 192 (1975)). We have held that an accomplice is a person who "could have been indicted and convicted for the crime with which the accused is charged." *State v. Palubicki*, 700 N.W.2d 476, 487 (Minn. 2005) (citing *State v. Pederson*, 614 N.W.2d 724, 733 (Minn.2000)). But "an accessory after the fact is not an accomplice." *State v. Henderson*, 620 N.W.2d 688, 701 (Minn. 2001) (citing *State v. Swyningan*, 304 Minn. 552, 555–56, 229 N.W.2d 29, 32 (1975)). An accomplice instruction "must be given in any criminal case in which any witness against the defendant might reasonably be considered an accomplice to the crime." *State v. Shoop*, 441 N.W.2d 475, 479 (Minn.1989). If the facts are undisputed, the district court determines whether a witness might reasonably be considered an accomplice, but if the "evidence is disputed or susceptible to different interpretations, then the question whether the witness is an accomplice is one of fact for the jury." *State v. Flournoy*, 535 N.W.2d 354, 359 (Minn.1995) (citing *State v. Jensen*, 289 Minn. 444, 447, 184 N.W.2d 813, 815 (1971)). If it is unclear whether a witness is an accomplice, the jury should make the determination. *Id.*

We conclude that the evidence indisputably indicates that Dobbins' girlfriend was not an accomplice to the murder. The record does not support Dobbins' argument on appeal that his girlfriend was involved in bringing Lavender to Dobbins' house, and there is no evidence that she talked to Lavender at City Center or even knew him. She played no role in Coleman bringing the gun to the house and she was not in the house when the shooting occurred. Because there was no testimony that Dobbins' girlfriend participated in the murder, we conclude that Dobbins was not entitled to a jury instruction that his girlfriend could be considered an accomplice to the murder. Therefore, we hold that the court did not err by withholding a jury instruction that Dobbins' girlfriend may be considered an accomplice to the murder.

### IV.

 We next consider Dobbins' argument that the state engaged in repeated prosecutorial misconduct and that the cumulative effect of this misconduct deprived him of a fair trial. Dobbins raises four claims of prosecutorial misconduct. We will first examine each claim individually to determine whether it constitutes misconduct. If we determine that there was misconduct, we will then examine that misconduct individually and cumulatively to determine whether the misconduct denied Dobbins a fair trial. We will review any objected-to prosecutorial misconduct to determine whether the misconduct is " 'harmless beyond a reasonable doubt.' " *State v. Swanson*, 707 N.W.2d 645, 657–58 (Minn.2006) (quoting *State v. Morton*, 701 N.W.2d 225, 233 (Minn.2005)). With respect to any unobjected-to prosecutorial misconduct, we will apply the plain error doctrine. *See State v. Ramey*, 721 N.W.2d 294, 297 (Minn.2006) (stating when a defendant fails to object at trial, he generally forfeits consideration of prosecutorial mis-

conduct on appeal, but a reviewing court can still address the misconduct under the plain error doctrine).

### A. Dobbins' Objected-to Prosecutorial Misconduct Claim

 Dobbins first argues that the state improperly cross-examined him by asking several questions designed to emphasize to the jury that Dobbins had been present throughout the trial and therefore was able to tailor his testimony to fit the state's case. We note that this is the only claim of prosecutorial misconduct that Dobbins objected to at trial. Dobbins' misconduct claim is based on the following exchange:

Q. Throughout the course of this trial, you've listened to all the witnesses?

A. Um-hum.

Q. Heard the testimony?

A. Yeah.

Q. And you've come to realize that you're the only witness who's gotten to hear anybody else's testimony; right?

A. Yeah. I hope so.

Q. You've had time to create what you told us today as it relates to the physical evidence?

A. No. My lawyers already knew. I already told ['em].

Q. I'm not asking what your lawyers knew.

ATTY: Objection, Your honor. He's asked a question.

THE COURT: Sustained.

ATTY: He's answered it.

Q. You've had time now to plan what you were going to say when you were on the stand?

A. No, I [did not] plan [anything].

Q. Didn't plan it?

A. No. I just told [the jury] what happened. I'm tellin' the truth, and I

want [the jury] to understand what happened.

\* \* \* \*

Q. You understand that no other witnesses had the access like you did to all of the information and all the testimony before they testified?

ATTY: Objection, irrelevant and speculative.

THE COURT: Sustained.

ATTY: Don't answer that.

This exchange contained seven questions about Dobbins' presence at his trial and his ability to tailor his testimony based on the evidence presented. We said in *Swanson* that:

[T]he prosecution cannot use a defendant's exercise of his right of confrontation to impeach the credibility of his testimony, at least in the absence of evidence that the defendant has tailored his testimony to fit the state's case. Without specific evidence of tailoring, such questions and comments by the prosecution imply that all defendants are less believable simply as a result of exercising the right of confrontation.

707 N.W.2d at 657–58 (footnote omitted). Here the state failed to present any evidence of Dobbins' "actual tailoring" that would justify this line of questioning; therefore, we conclude that the state's questions were improper and constituted prosecutorial misconduct.

 But Dobbins is not entitled to relief if the state's misconduct was harmless beyond a reasonable doubt. *Id.* at 658. In other words, we will not grant Dobbins a new trial if we conclude the jury's guilty verdict was "surely unattributable" to the misconduct. *State v. Hunt*, 615 N.W.2d 294, 302 (Minn.2000). Here, we conclude that the jury's guilty verdict was surely unattributable to the

state's questions regarding Dobbins' presence at his trial.

The following reasons support our conclusion. First, the district court timely sustained Dobbins' objections and, in doing so, significantly reduced the impact of the state's improper questions on the jury verdict. *See State v. Steward,* 645 N.W.2d 115, 122 (Minn.2002) (stating "the jury must be presumed to have followed the [district] court's instructions and to have disregarded any question to which an objection was sustained"). Second, during the cross-examination, Dobbins explicitly stated that he was simply telling the jury what had happened and denied planning his testimony based on other witnesses. Third, the evidence in this case overwhelmingly indicates that Dobbins shot and killed Lavender. King testified that he saw Dobbins shoot Lavender, and his testimony was consistent with that of Dobbins' girlfriend and her two sisters, who testified that Dobbins told them that he shot Lavender. King's testimony was also consistent with forensic evidence. In contrast, Dobbins' testimony that King shot Lavender was uncorroborated. In light of the evidence against Dobbins and the district court's sustaining of Dobbins' objections to the state's questions, we conclude that the jury's guilty verdict was "surely unattributable" to the state's misconduct. We therefore hold that the state's misconduct in asking questions directed to Dobbins' exercise of his right of confrontation was harmless beyond a reasonable doubt.

### B. Dobbins' Unobjected-to Prosecutorial Misconduct Claims

 We now turn to Dobbins' claims of unobjected-to prosecutorial misconduct. Generally, a defendant who fails to object to prosecutorial misconduct at trial waives the issue on appeal. *Rairdon v. State,* 557 N.W.2d 318, 323 (Minn.1996).

But as noted earlier, we still may review unobjected-to misconduct under the plain error doctrine. *Ramey,* 721 N.W.2d at 297. Plain error consists of (1) error, (2) that is plain, and (3) affects substantial rights. *State v. Leake,* 699 N.W.2d 312, 327 (Minn.2005) (citing *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998)), *cert. denied,* —— U.S. ——, 126 S.Ct. 745, 163 L.Ed.2d 583 (2005). In the context of unobjected-to prosecutorial misconduct, we have recently held that the third prong of the plain error doctrine requires the state to bear the burden of persuasion to demonstrate that there was a lack of prejudice by the misconduct and that the misconduct did not significantly affect the outcome of the case. *Ramey,* 721 N.W.2d at 302. Therefore, when a defendant seeks relief based on unobjected-to prosecutorial misconduct, the state must, under the third prong, show that "there is no reasonable likelihood that the absence of the misconduct in question 'would have had a significant effect on the verdict of the jury.'" *Id.* (quoting *State v. MacLennan,* 702 N.W.2d 219, 236 (Minn.2005)). Under the new approach adopted in *Ramey,* the defendant still must demonstrate that the stated conduct constitutes an error that is plain, but then the burden of persuasion shifts to the state. *Id.* If the three prongs of the plain error test are met, we will "then [assess] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* "We will correct the error only if the fairness, integrity, or public reputation of the judicial proceeding is seriously affected." *State v. Morton,* 701 N.W.2d 225, 234 (Minn.2005) (citing *State v. Jones,* 678 N.W.2d 1, 18 (Minn. 2004)).

#### 1. Dobbins' Right to Remain Silent and Right to Counsel

 Dobbins argues that the state improperly cross-examined him about his

constitutional right to remain silent and his constitutional right to counsel. Dobbins asserts that the following line of questioning was improper:

Q: [The police detective] was asking you questions?

A: Yeah. He tried to ask me questions, but I said I [would] just take a lawyer. I still want a lawyer. Talk to a lawyer.

Q: And before that, you never told [him] anything about that you saw Myshohn King shoot anybody?

A: I was—That's what I was [going to] tell [him].

Q: That's—Answer my question.

A: Yeah.

Q: You didn't tell him?

A: I didn't tell [him] anything.

Q: Anything about Myshohn King shooting anybody; did you?

A: I didn't tell [him] anything.

Q: You didn't tell him at the time as it happened you were in your back bedroom ironing your new Globetrotters outfit; did you?

A: I didn't tell [him] anything.

Q: And he was asking you at that time?

A: He asked me if I still wanted a lawyer, and I told [him], you know, then again I think I might be comfortable with a lawyer present, so that's how that conversation ended, and all the conversation with the police was [nothing] but a few seconds. It wasn't a long conversation. Once he told me I had a right to have a lawyer there, that's what I requested.

At this point, the district court asked the parties to approach the bench. A discussion was held at the bench, after which the questioning resumed, but on a different topic.

The record indicates that after Dobbins was arrested, he was questioned by the police on two occasions, December 6, 2003, and December 16, 2003.[2] On December 6, he was given a *Miranda* warning, was asked a few questions, and then stated, "I'm not here to answer your questions today." He then said, "I think I need a lawyer for that." After these statements, the questioning ended. Dobbins was questioned again on December 16 after he indicated he wanted to talk to the police. It was the December 16 session to which the foregoing cross-examination referred. Dobbins was given the *Miranda* warning at the beginning of this session and the questioning continued until Dobbins once again stated that he wanted to talk to a lawyer, at which point the questioning ended.

We have held that the state generally may not refer to or elicit testimony about a defendant's post-arrest silence and/or request for counsel. *State v. McCullum*, 289 N.W.2d 89, 92 (Minn.1979). In addition, "[e]vidence that a defendant exercised his rights to remain silent or to have an attorney present for questioning is generally inadmissible at trial." *State v. Penkaty*, 708 N.W.2d 185, 199 (Minn.2006) (citing *State v. McCullum*, 289 N.W.2d 89, 92 (Minn.1979)). The state nonetheless argues that its line of questioning did not constitute prosecutorial misconduct because the questions during cross-examination focused on the timeframe before Dobbins asked for counsel and asserts that it is proper "to cross-examine a defendant

**2.** We note that the date stated in the text of the transcript for the second occasion is December 16, but this date is inconsistent with the December 19 date listed in the caption of the transcript. For the purposes of our discussion, the exact date is not relevant.

about what he didn't say to police *before* asking for counsel."

The state correctly notes that, as Dobbins' testimony indicates, the police stopped questioning Dobbins once he asserted his right to counsel. It then relies upon our prior case law that holds that "the constitution does not bar the use of postarrest silence to impeach the defendant's credibility where no *Miranda* warning was given." *State v. Morrison*, 351 N.W.2d 359, 361 (Minn.1984) (citing *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982)). The state's argument raises a key point when it focuses on Dobbins' silence before he asked for counsel, but ignores the fact that Dobbins had been given two separate *Miranda* warnings and the state's line of questioning focused on Dobbins' silence after he was given the *Miranda* warnings.

The United States Supreme Court has held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In explaining its holding, the Court said:

> Silence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested (citation and footnote omitted). Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial (footnote omitted).

*Id.* at 617–18, 96 S.Ct. 2240. Shortly after *Doyle* was decided, we adopted its holding in *State v. Billups*, 264 N.W.2d 137, 139 (Minn.1978). In *Billups*, we said that "it was error to permit the impeachment of defendant by cross-examination which showed his failure to offer alibi evidence at any time prior to the trial" and that "the prosecutor should not discuss this facet of the case in his argument." *Id.* Therefore, based on both Supreme Court case law and our case law, we conclude that the state's line of questioning in cross-examination of Dobbins about his failure to implicate Myshohn King when he was interrogated by the police constitutes unobjected-to prosecutorial misconduct.[3] But we also note that the line of questioning was limited—seven questions—and ended immediately after the judge asked the parties to approach the bench.

### 2. "Are they lying?" Questions

Dobbins next argues that the state improperly asked a series of "Are they lying?" type questions. Dobbins asserts that the state should not have been allowed to ask him on cross-examination if the state's witnesses were lying.

**3.** We acknowledge that unlike the defendants in *Doyle* and *Billups*, Dobbins initiated the police interview to which the improper cross-examination referred. Moreover, after Dobbins received a *Miranda* warning at the beginning of that interview, he chose to speak about topics other than his alibi. It could be argued that Dobbins' decisions to seek the December 16 interview and to talk with police about some topics gave the state permission to cross-examine him about his failure to disclose his alibi. But the state has not made this argument to our court. We therefore conclude that in the context of this case, *Doyle* and *Billups* prohibit the cross-examination at issue.

Q: It's your position, Mr. Dobbins, that you've been falsely accused of this crime?

A: Exactly.

Q: Falsely accused by Myshohn King—

A: Exactly

Q: —Who was your friend?

A: And mainly you.

Q: Falsely accused by Andre Coleman?

A: No.

Q: He's your cousin?

A: (Shakes head.)

Q: Falsely accused by Thaijuana [last name]?

A: (Shakes head.)

Q: Falsely accused by Shiniqua [last name]?

A: (Shakes head.) They said what they thought I said which that wasn't true.

Q: Falsely accused by statements of Derrick [last name]?

A: What he say that was incriminatin' to me?

Q: And falsely accused by your girlfriend [name]?

A: Yeah. It can't happen?

We have held that, as a general rule, "Are they lying?" type questions are inappropriate. *Morton*, 701 N.W.2d at 233.[4] We explained that this type of questioning shifts the jury's focus by creating the impression that the jury must conclude the relevant witnesses were lying in order to acquit a defendant. *Id.* at 235. We stated that the state can ask "Are they lying?"

type questions only if "the defendant 'holds the issue of the credibility of the state's witnesses in central focus.' " *Id.* at 233 (quoting *State v. Pilot*, 595 N.W.2d 511, 518 (Minn.1999)). In this regard, it is not enough that the defendant's testimony contradicted the witnesses' testimony. *Id.* at 235.

 In the instant case, King testified that he saw Dobbins shoot Lavender, an accusation that Dobbins vigorously denied in his testimony. Dobbins further testified that King shot Lavender. As a result, Dobbins' testimony regarding who shot Lavender put King's credibility in "central focus." We therefore conclude that the state did not commit misconduct by asking Dobbins if King was lying. *See Morton*, 701 N.W.2d at 235.

 The testimony of Dobbins' girlfriend and her two sisters also contradicted Dobbins' testimony, but in contrast to King, these witnesses testified that they were not present during the shooting. As such, part of Dobbins' girlfriend's and her two sisters' testimony constituted circumstantial evidence against Dobbins and not their personal observations about which they were testifying. Further, Dobbins did not indicate in his testimony that his girlfriend and her sisters were deliberately falsifying their testimony when they related what he had said to them.[5] As such, we conclude that Dobbins did not put his girlfriend's and her sisters' credibility in "central focus." Accordingly, Dobbins' testimony does not justify the state's questions with respect to their testimony. We

---

4. It is important for our plain error analysis to note that Dobbins' trial took place in the fall of 2004, more than nine months before we released *Morton*, which modified our holding in *State v. Pilot*, 595 N.W.2d 511 (Minn. 1999).

5. We note that during cross-examination, Dobbins stated that he was falsely accused by his girlfriend. Dobbins' answer, however, was in response to the state's improper question, and as such, cannot be used to justify the state's question of whether Dobbins' girlfriend was lying.

therefore conclude the state's questions to Dobbins about whether the testimony of his girlfriend and her two sisters was false were improper.

### 3. Other Unobjected-to Prosecutorial Misconduct

Dobbins next argues that the state engaged in a series of misconduct that diverted the jury's attention from issues of guilt or innocence. During cross-examination, the state asked Dobbins if he was the father of his girlfriend's son and if he was faithful to his girlfriend. The state also initiated the following exchange:

Q: In the world you live in, Mr. Dobbins, people shouldn't tell about things they saw; correct?

A: What world? I live in the same world you live in.

Q: And people shouldn't tell, in your world, even if it's the truth?

A: I live in the same world you live in.

Q: And it takes courage to tell the truth about what you see?

A: Like I say, I [do not have anything] to do with all that.

Later, during the closing argument, the state told the jury that, "I would know the difference and I would be honest when I testify. Desperation and self-preservation can lead to some pretty fanciful tales."

We have held that the state should refrain from asking questions or making arguments that would divert the jury from its duty to decide a case on the evidence by injecting issues broader than a defendant's guilt or innocence into the trial. *State v. Washington,* 521 N.W.2d 35, 40 n. 3 (Minn.1994) (quoting 1 *ABA Standards,* The Prosecution Function 3–5.8(d) (2d ed.1982)). Our review of the record indicates that the state's questions regarding Dobbins' relationship with his girlfriend were not relevant to the issue of Dobbins'

guilt or innocence. As such, these remarks impermissibly questioned Dobbins' character.

We find the state's "your world" comments to be more troubling. While we have held in *State v. Robinson,* 604 N.W.2d 355, 363 (Minn.2000), that a statement describing a defendant as not being from the same world as the jurors was not misconduct when "these comments did little more than prepare the jury for evidence of an unfamiliar world involving drugs," we have repeatedly emphasized that it is improper for the state to highlight a defendant's racial or socioeconomic status as a way to put evidence in context. *See, e.g., State v. Ray,* 659 N.W.2d 736, 746–47 (Minn.2003). While it is not clear exactly what the state was referring to when it first made the "your world" comment, we are concerned that, after Dobbins specifically pointed out to the state that he lived in the same world as everyone else, the state made no attempt to clarify to the jury that its "your world" comment was not a reference to Dobbins' racial or socioeconomic background. We have said that we will not tolerate such remarks and we conclude that here the state engaged in prosecutorial misconduct in making these "your world" comments.

With respect to the state's comments during closing argument regarding what the prosecutor would do, the state concedes that these comments were improper, and we agree. We have held that the state cannot exploit the influence of its office by injecting personal opinions into a case. See *State v. Everett,* 472 N.W.2d 864, 870 (Minn.1991). We therefore conclude that this part of the state's closing argument also constituted prosecutorial misconduct.

4. Plain Error Analysis

■■■ Having concluded that the state committed unobjected-to prosecutorial misconduct, we now turn to the question of whether Dobbins is entitled to relief under the plain error doctrine. We have held that "[t]he prosecutor is a 'minister of justice'" and is obligated "'to guard the rights of the accused as well as to enforce the rights of the public.'" *State v. Cabrera,* 700 N.W.2d 469, 475 (Minn.2005) (quoting 1 ABA Standards for Criminal Justice, The Prosecution Function 3–1.1 and commentary at 3.7 (2d ed.1979)). As such, prosecutorial misconduct constitutes error. An error is plain if it is "clearly contrary to the law at the time of appeal." *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Because the type of misconduct at issue has already been addressed and disapproved in our case law, we conclude that each instance of misconduct is an error that is plain.

But we conclude that the state has met its burden under *Ramey* to show that the unobjected-to statements by the state, individually or cumulatively, were not prejudicial. As previously discussed, the state's case against Dobbins was very strong, and the evidence, both in the form of witness testimony and forensic evidence, overwhelmingly indicates that Dobbins shot and killed Lavender. As such, Dobbins' first-degree murder conviction was supported by admissible evidence and was not significantly affected by the misconduct that occurred. In light of this strong evidence against Dobbins, the state has shown that there is no reasonable likelihood that the absence of the misconduct at issue would have a significant effect on the jury's verdict. Therefore, we conclude that the unobjected-to prosecutorial misconduct does not meet the third prong of the plain error doctrine.

■■■ We further conclude that, because Dobbins' murder conviction was surely unattributable to the objected-to prosecutorial misconduct regarding Dobbins' constitutional right of confrontation and that the unobjected-to prosecutorial misconduct did not affect Dobbins' substantial rights, the cumulative effect of the state's misconduct did not deprive Dobbins of a fair trial. We therefore decline to grant Dobbins a new trial on the basis of the cumulative effect of all the prosecutorial misconduct. We note that the Constitution guarantees a fair trial—not a perfect or error-free trial. *Greenleaf,* 591 N.W.2d at 505.

V.

■■■ Dobbins' last argument is that his trial counsel's failure to object to the prosecutorial misconduct identified above constituted ineffective assistance of counsel. To succeed in an ineffective assistance of counsel claim, a convicted defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Jackson,* 714 N.W.2d 681, 697 (Minn.2006). In the instant case, because the prosecutorial misconduct at issue did not affect the outcome of Dobbins' trial, Dobbins was not prejudiced by his trial counsel's failure to object. As such, Dobbins' ineffective assistance of counsel claim also fails.

Affirmed.

HANSON, Justice (dissenting).

I respectfully dissent on the issue of prosecutorial misconduct. Because there were multiple acts of misconduct and all but one was of a type that we have specifically addressed and clearly prohibited in previous decisions, I would reverse Dobbins' conviction prophylactically, without

engaging in either a harmless error or a plain error analysis. *State v. Salitros,* 499 N.W.2d 815, 820 (Minn.1993) (reversing conviction in the interests of justice for improper remarks by the prosecution in closing argument about the defendant's character, even though the defendant made no objection and the court did not find prejudice). If we do not reverse this conviction, with six serious acts of prosecutorial misconduct, the concept that the prosecutor is a "minister of justice" has no meaning.

## A.

The five acts of misconduct acknowledged by the majority are: (1) cross-examination questions that used Dobbins' right of confrontation to impeach his testimony; (2) cross-examination questions that emphasized Dobbins' silence and then his request for counsel during the custodial interrogation[1]; (3) cross-examination questions that asked Dobbins whether other witnesses, whose credibility was not put into central focus, were lying; (4) cross-examination questions that challenged Dobbins' character based on his unfaithfulness to his girlfriend; and (5) cross-examination questions and closing argument that attempted to separate defendant from the jurors and to align the prosecutor with the jurors, by using "your world" references to emphasize racial and socioeconomic differences and by stating what the prosecutor would do if she were in Dobbins' position.

These acts of misconduct were not isolated or inadvertent. They appear to have been deliberate, not arising spontaneously in the heat of trial. And they were flagrant because they were pursued with persistence and intensity. Our opinions condemning this type of conduct are meaningless if we allow the state, which apparently believed at trial that such misconduct was necessary to assure a guilty verdict, to now avoid appellate sanctions by arguing that the defendant cannot prove that the misconduct had a significant effect on the verdict. I conclude that this is one of the extreme cases that requires reversal in order to effectively exercise our supervisory powers.

## B.

Further, I disagree with the majority's conclusion that the "was he lying?" question directed at the testimony of King did not amount to prosecutorial misconduct. I acknowledge that the state may have relied on the confusion generated by our decision in *State v. Morton,* where we created an exception for such questions where the defendant places the credibility of a state's witness into "central focus." 701 N.W.2d 225, 233 (Minn.2005) (quoting *State v. Pilot,* 595 N.W.2d 511, 518 (Minn.1999)). But I would put an end to that exception because it does nothing to resolve the evidentiary objections to this type of question.

Asking one witness to opine on the veracity of another witness calls for impermissible speculation, lacks foundation and is, at best, argumentative. It violates several rules of evidence, including Rule 401 (excluding irrelevant evidence); Rule 403 (excluding relevant evidence whose probative value is substantially outweighed by the possibility of unfair prejudice or confusion); Rule 602 (requiring that a witness testify only about matters shown to be within her personal knowledge); Rule 701

---

1. This cross-examination had no conceivable purpose but to suggest to the jury that Dobbin's silence and his request for counsel were an indication of guilt. The fact that the state asked the question seven times, in seven different ways, suggests that the state was insistent that the prejudice not be lost on the jury.

(restricting opinion evidence by lay witnesses); and Rule 702 (requiring foundation for expert opinion evidence). A defendant does not open the door to such a question by merely testifying in a way that contradicts the testimony of another witness. I would conclude that the "was he lying?" question relative to King was a sixth act of misconduct.

PAGE, Justice (dissenting).

I join in the dissent of Justice Hanson.

MEYER, Justice (dissenting).

I join in the dissent of Justice Hanson.